UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

UNITED STATES OF AMERICA,

        Plaintiff,

    -against-

NEW YORK CITY BOARD OF EDUCATION; CITY OF NEW YORK; LILLIAM BARRIOS-PAOLI, PERSONNEL DIRECTOR, NEW YORK CITY DEPARTMENT OF PERSONNEL (in her official capacity); NEW YORK CITY DEPARTMENT OF PERSONNEL,

        Defendants,

    and

JOHN BRENNAN; JAMES G. AHEARN; DENNIS MORTENSON and SCOTT SPRING,

        Intervenors,

    and

JANET CALDERO, CELIA I. CALDERON, MARTHA CHELLEMI, ANDREW CLEMENT, KRISTEN D'ALESSIO, LAURA DANIELE, CHARMAINE DIDONATO, DAWN L. ELLIS, MARCIA P. JARRETT, MARY KACHADOURIAN, KATHLEEN LUEBKERT, ADELE A. MCGREAL, MARIANNE MAOUSAKIS, SANDRA D. MORTON, MAUREEN QUINN, HARRY SANTANA, CARL D. SMITH, KIM TATUM, FRANK VALDEZ and IRENE WOLKIEWICZ,

        Intervenors,

    and

PEDRO ARROYO, JOSE CASADO, CELESTINO FERNANDEZ, KEVIN LAFAYE, STEVEN LOPEZ, ANIBAL MALDONADO, JAMES MARTINEZ, WILBERT MCGRAW, SILVIA ORTEGA DE GREEN

**MEMORANDUM & ORDER**

ACTION I
No. 96-CV-0374 (FB) (RML)

and NICOLAS PANTELIDES,

Intervenors.

----------------------------------------------------------------------x
----------------------------------------------------------------------x

JOHN BRENNAN; JAMES AHEARN; ERNIE TRICOMI; SCOTT SPRING; DENNIS MORTENSEN; JOHN MITCHELL and ERIC SCHAUER,

Plaintiff,

-against-

JOHN ASHCROFT; RALPH BOYD; UNITED STATES DEPARTMENT OF JUSTICE; NEW YORK CITY BOARD OF EDUCATION; CITY OF NEW YORK; NEW YORK CITY DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES and WILLIAM J. DIAMOND,

ACTION II
No. 02-CV-0256 (FB) (RML)

Defendants

----------------------------------------------------------------------x

*Appearances:*
*For the Plaintiff:*
CHARLES E. LEGGOTT, ESQ.
United States Department of Justice
Employment Litigation Section
950 Pennsylvania Ave., N.W.
Washington, DC 20530

*For the Defendants:*
LAWRENCE J. PROFETA, ESQ.
The City of New York Law Department
100 Church St.
New York, NY 10007

*For the Intervenors:*
*For Intervenor Brennan, et al.:*
MICHAEL E. ROSMAN, ESQ.
Center for Individual Rights
1233 20th Street, N.W., Suite 300
Washington, DC 20036

*For Intervenor Arroyo, et al.:*
MATTHEW B. CALANGELO, ESQ.
NAACP Legal Defense Fund &
Educational Fund, Inc.
99 Hudson St., 16th Floor
New York, NY 10013

*For Intervenor Caldero, et al.:*
EMILY J. MARTIN, ESQ.
American Civil Liberties Union
Women's Rights Project
125 Broad St., 18th Floor
New York, NY 10004

**BLOCK, Senior District Judge:**

## TABLE OF CONTENTS

INTRODUCTION ................................................................. 4

BACKGROUND ................................................................. 8

    A. The Substance of the United States' Action ........................ 8
        1. The Testing Claims ......................................... 9
            a. Hiring Practices ........................................ 9
            b. Custodian Exam No. 5040 ........................... 10
            c. Custodian Engineer Exam Nos. 8206/8609 ............... 10
            d. Custodian Exam No. 1074 ........................... 11
        2. The Recruiting Claim ...................................... 12
    B. The Settlement Agreement ...................................... 15
    C. The Impact of the Settlement Agreement on Seniority ............. 17
        1. School Building Transfers .................................. 18
        2. Temporary Care Assignments .............................. 20
        3. Layoffs .................................................. 22
    D. The Fairness Hearing and
        Magistrate Judge Levy's Memorandum and Order ................ 23
    E. The Second Circuit's Remand .................................. 27
    F. The Post-Remand Interventions ................................ 30
        1. The Brennan Interventions ................................ 30
        2. The Caldero and Arroyo Interventions ..................... 31
    G. Post-Remand Challenges By The Brennan Intervenors ............. 31
        1. Challenges to the Reputed Protected Class ................. 31
        2. Challenges to the Testing Claims .......................... 32
            a. Proof of Discrimination ................................ 32
            b. Non-Victims of Discrimination ......................... 34
        3. Challenges to the Recruiting Claim ........................ 36
            a. Proof of Discrimination ................................ 36
            b. Non-Victims of Discrimination ......................... 38
    H. Issues Briefed ................................................ 39

DISCUSSION ................................................................. 39

### Preliminary Matters

    A. Brennan Intervenors' Status ................................... 39
    B. Effect of the Summary Judgment Motions on Action II ........... 40
    C. Protected Class .............................................. 41

## Title VII

A. Statistical Basis For the Affirmative-Action Plan ................................ 42
    1. Testing Claims ................................................ 47
    2. Recruiting Claim ............................................. 50
B. Relief ................................................................ 52
    1. Transfers and TCAs ......................................... 58
    2. Layoffs ..................................................... 59

## Fourteenth Amendment

A. Race-Based Classifications ........................................... 65
    1. Compelling Interest For Race-Based Relief ................... 65
    2. Narrowly Tailored .......................................... 72
        a. Transfers and TCAs ..................................... 73
        b. Layoffs ............................................... 75
B. Sex-Based Classifications ............................................ 78
    1. Important Governmental Interest ............................ 80
    2. Substantially Related ...................................... 81

## Remaining Matters

A. Propriety of Entry of a Consent Judgment ............................ 82
B. Class Certification .................................................. 84

**RECAPITULATION** ................................................... 88

A. Testing Claims ..................................................... 88
B. Recruiting Claim ................................................... 88
C. Reflections ........................................................ 89

**CONCLUSIONS** ..................................................... 90

## INTRODUCTION

In 1993, the New York City Board of Education (the "Board") conducted a

demographic survey of its Custodians and Custodian Engineers (collectively, "custodial

employees");[1] it disclosed that 99% of its 831 permanent custodial employees were men,

---

[1]Although Custodians and Custodian Engineers perform many of the same
duties, Custodian Engineers are required to have qualifications above and beyond what
is required of a Custodian, the most significant of which is a stationary engineer's

and that 92% were white.[2]  A few years later, in 1996, the United States, in Action I, sued

the Board pursuant to section 707(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e-6(a),[3] claiming that three entry-level examinations that the Board had

administered, as well as the recruiting practices it had used to publicize those exams,

violated Title VII.  The lawsuit resulted in a Settlement Agreement (the "Agreement")

that awarded employment benefits to a group of 59 individuals (the "beneficiaries")

composed of black, Hispanic and Asian men and women, and non-minority females.

*See* Jan. 10, 2005 Decl. of James Lonergan, Ex. I (Agreement).

This spawned interventions in that action by two groups supportive of the

settlement, and one group opposed.  Those supportive were 31 of the 59 beneficiaries

(the "Caldero" and "Arroyo" intervenors).  Those opposed were four white male

custodial employees (the "Brennan" intervenors), who railed against the adverse effect

the Agreement had on their seniority rights in regard to (1) school building transfers, (2)

temporary care assignments, and (3) layoffs; rather than rely on their intervention

rights, they also, together with two other white male custodial employees, brought a

---

license.  *See* Dec. 23, 2004 Decl. of Emily Martin, Ex. 54 (Apr. 8, 2002 Decl. of James
Lonergan) at 10.  The positions of Custodian and Custodian Engineer are now referred
to as "Custodian Engineer Level 1" and "Custodian Engineer Level 2," respectively.
The Court, however, will maintain the old terminology.

[2]Caldero 56.1 Statement of Facts ¶ 4; Dec. 23, 2004 Decl. of Emily Martin, Ex. 3
(Def.'s Response to Plaintiff's First Set of Requests for Admission) at 9; *id.*, Ex. 2 (Ethnic
Survey - '93).

[3]Section 707 authorizes the United States Attorney General to bring a civil action
whenever he or she "has reasonable cause to believe that any person or group of
persons is engaged in a pattern or practice of resistance to the full enjoyment of any of
the rights secured by this subchapter, and that the pattern or practice is of such a nature
and is intended to deny the full exercise of th[os]e rights . . . ."

separate action (Action II).[4] In both actions, all the white males assert that their seniority rights were violated in those three aspects under both Title VII and the Fourteenth Amendment, and seek injunctive relief.[5] The two additional white males in Action II also seek monetary damages because they allegedly were denied school building transfers that, under the Agreement, were instead given to two unidentified beneficiaries.[6]

After extensive pre-trial proceedings and a protracted procedural history, the issue of the validity of the challenged parts of the Agreement is now presented to the Court by the intervenors' respective motions for partial summary judgment in Action I.[7] Also before the Court are a motion in Action I by the Board to enter the

---

[4]By order dated November 24, 2004, the Court consolidated both actions pursuant to Fed. R. Civ. P. 42(a).

[5]Although the Board is a governmental actor subject to the Fourteenth Amendment, it is not an arm of the state entitled to Eleventh Amendment Immunity. *See Fay v. South Colonie Sch. Dist.*, 802 F.2d 21, 27 (2d Cir. 1986) ("State action for purposes of the Fourteenth Amendment is not equal to *being* the state for purposes of the Eleventh Amendment."), *overruled in part on other grounds by Taylor v. Vermont Dept. of Educ.*, 313 F.3d 768 (2nd Cir. 2002).

[6]The named parties in Action II were the four Brennan intervenors – John Brennan ("Brennan"), James Ahearn ("Ahearn"), Dennis Mortenson ("Mortenson") and Scott Spring ("Spring")) and three others (Ernie Tricomi, John Mitchell and Eric Schauer). Mitchell and Schauer are the two seeking monetary damages; Tricomi has withdrawn from the litigation. *See* Not. of Voluntary Dismissal by Pl. Ernie Tricomi (Jan. 16, 2003).

[7]More specifically, the Caldero and Arroyo intervenors seek a declaratory judgment that the challenged provisions of the Agreement comport with Title VII and the Fourteenth Amendment, *see* Caldero Intervenors' Mot. for Partial Summ. J. at 2; Arroyo Intervenors' Mot. for Partial Summ. J. at 1-2; conversely, the Brennan intervenors seek a declaratory judgment that the challenged provisions violate Title VII and the Fourteenth Amendment. *See* Brennan Intervenors' Mot. for Partial Summ. J. at 2.

Agreement as a consent judgment,[8] and motions by the white males in both actions for class-action certification.[9]

The Court declines to enter the Agreement as a consent judgment. The Court declares, however, that the Agreement is valid under Title VII, except to the extent that it grants preferential seniority as to layoffs to non-victims of race, national origin and gender discrimination.[10] The Court further declares that the Agreement is also valid under the Fourteenth Amendment, except to the extent that it (1) grants preferential seniority as to layoffs to non-victims of discrimination, and (2) grants relief to racial or ethnic minorities based on the recruiting claim. The Court also declares that

---

[8]The United States initially joined in the Board's motion; however, it subsequently, in effect, withdrew its support. *See* United States's Mem. of Points and Authorities in Response to this Court's Order of July 20, 2004, at 9 ("[T]o the extent that the Brennan Intervenors have standing to challenge certain provisions of the Agreement, those provisions cannot be entered as a consent judgment over their objection."). Although the Caldero and Arroyo intervenors have not formally joined in the motion, they support it.

[9]Since the inception of the litigation, the parties have submitted 42 legal memoranda, 36 declarations and 246 letters from counsel; as to the pending summary judgment motions, the submissions include more than 500 pages of legal memoranda and letter briefs, and a seven-foot mountain of supporting documentation that nearly fills 7 banker's boxes. Notwithstanding the parties' contributions, the Court has expended a tremendous amount of its own judicial resources developing the relevant facts and staking out the correct conceptual analysis.

[10]The Court uses the term "non-victims" to refer to beneficiaries who were not impacted by any of the discriminatory practices, and beneficiaries who, although victims of discrimination, received relief that was not make-whole in nature (i.e., the relief went beyond that necessary to put them in the position that they would have been in but for discrimination). In appropriate circumstances, "the voluntary action available to employers . . . seeking to eradicate race discrimination may include reasonable race-conscious relief that benefits individuals who were not the actual victims of discrimination." *Local No. 93, Int'l Assoc. of Firefighters v. City of Cleveland*, 478 U.S. 501, 516 (1986) (citing *United Steel Workers of America v. Weber*, 443 U.S. 193 (1979)).

one of the 59 beneficiaries is not a member of protected class. Finally, the Court grants class-action status to those whose layoff-protection rights were displaced by non-victims of discrimination.[11]

There are issues of fact which must now be resolved as to (1) whether there was sufficient evidence of discrimination in respect to one of the challenged exams; (2) the number of non-female blacks, Hispanics and Asians who received relief under the recruiting claim; (3) the number of blacks and Hispanics receiving preferential seniority for purposes of layoffs under the testing claims who were not actual victims of discrimination; and (4) the identities of the individual beneficiaries who received the transfers sought by the two additional white males in Action II.

## BACKGROUND

### A. The Substance of the United States' Action

The United States initiated Action I on January 30, 1996. Although it alleged both pattern and practice disparate-treatment claims – requiring proof of intentional discrimination – and disparate-impact claims, it pursued only the disparate-impact claims. The United States claimed that the Board's hiring practices for custodial employees (the "custodial positions") violated Title VII in two respects: (1) that three

---

[11]There are three other pending motions, which the Court summarily denies: (1) the Board's motion seeking judicial enforcement of Paragraph 9 of the Agreement, which provides that if any party challenged a provision of the Agreement, the United States and the Board "shall take all reasonable steps to defend fully the lawfulness of any such provision"; (2) the United States' motion to strike a declaration submitted by the Board in support of its motion for enforcement of Paragraph 9; and (3) a motion by the Brennan intervenors to strike certain arguments made by the parties in their motion papers. In light of the Court's decision, these three motions are of no substantive significance.

written tests, administered as a prerequisite for obtaining a custodial position, had a disparate impact on blacks and Hispanics (the "testing claims"); (2) that the Board's recruiting practices for those tests had a disparate impact on blacks, Hispanics, Asians and females (the "recruiting claim"). The relevant tests were three entry-level exams: Custodian Exam No. 5040, Custodian Engineer Exam Nos. 8206/8609,[12] and Custodian Exam No. 1074.

## 1. The Testing Claims

### a. Hiring Practices

The Board periodically administered written, multiple-choice civil-service examinations to identify eligible candidates for permanent custodial positions. Those who passed the exams and met the other eligibility requirements – which included, *inter alia*, English-language proficiency – were ranked and placed on eligibility lists. When a position became available, the top three candidates on the relevant list were interviewed, and one was appointed. Unsuccessful interviewees could be interviewed two more times; if they were not successful, they were removed from the list.

The eligibility list created from Exam No. 5040 governed the hiring of Custodians between the spring of 1987 and the fall of 1990; 154 of 678 placed on that list were hired. The eligibility list created from Exam No. 1074 governed the hiring of Custodians from early 1997 until early 2000; 244 of 524 were hired. The eligibility list created from Exam Nos. 8206/8609 governed the hiring of Custodian Engineers

_____

[12]Custodian Engineer Exam No. 8609, which was a promotional exam given to Custodians who wanted to be considered for Custodian Engineer positions, was identical to Custodian Engineer Exam No. 8206, which was given to members of the general public who were seeking Custodian Engineer positions.

between the spring of 1991 and early 1994; 46 of 335 were hired. If there were no eligible candidates when a custodial position became available, the Board solicited resumes for "provisional" – as opposed to "permanent" – positions. The most qualified applicants were selected for interviews, and the most qualified interviewee was hired.

**b. Custodian Exam No. 5040**

Custodian Exam No. 5040 was administered in December 1985. The Department of Personnel then reviewed the "experience papers" of each successful exam-taker to determine if the applicant had the required amount of experience and/or education as advertised in the notice publicizing the exam; a negative determination could be administratively appealed. Applicants who passed the exam and had the requisite experience were given a "practical oral" exam, which was graded on a pass/fail basis. Those who passed were deemed eligible to be hired as Custodians.

**c. Custodian Engineer Exam Nos. 8206/8609**

Custodian Engineer Exam Nos. 8206/8609 were administered in May 1989. The Department of Personnel then reviewed the "experience papers" of each successful exam-taker to determine if the applicant had (1) the required amount of experience and/or education as advertised in the notice publicizing the exam, and (2) a license to operate a high pressure boiler; a negative finding in regard to experience papers could be administratively appealed. Unlike Custodian Exam No. 5040, there was no "practical oral" exam; rather, those who met the experience prerequisites were deemed eligible to be hired as Custodian Engineers.

**d. Custodian Exam No. 1074**

Custodian Exam No. 1074 was administered in January 1993. Applicants who passed the exam were then given a further, practical written exam, which was graded on a pass/fail basis. The Department of Personnel then reviewed the "experience papers" of each applicant who had passed both the initial multiple-choice exam and the practical exam to determine if the applicant had the required amount of experience and/or education as advertised in the notice publicizing the exam; a negative finding in regard to experience papers could be administratively appealed. Those who met the minimum prerequisites were deemed eligible to be hired as Custodians.

In support of its testing claims, the United States relied on a statistical analysis of pass rates compiled by Bernard R. Siskin, Ph.D. ("Dr. Siskin") and Dr. Leonard Cupingood, Ph.D. ("Dr. Cupingood"); their results were as follows:

|  | No. 5040 | No. 8206[13] | No. 1074 |
|---|---|---|---|
| Passing white applicants | 58.1% | 85.1% | 61.7% |
| Passing black applicants | 14.1% | 50.0% | 14.4% |
| Passing Hispanic applicants | 27.7% | 71.1% | 30.8% |
| Pass rate for black applicants divided by pass rate for white applicants | 24.3% | 58.8% | 23.3% |
| Pass rate for Hispanic applicants divided by pass rate for white applicants | 47.7% | 83.5% | 49.9% |
| Disparity between the pass rate for white and black applicants (# of Standard Deviations)[14] | 13.85 | 5.14 | 12.51 |
| Disparity between the pass rate for white and Hispanic applicants (# of Standard Deviations) | 8.09 | 2.15 | 8.06 |

## 2. The Recruiting Claim

The recruiting claim centered on the practices the Board used to recruit individuals for the exams; the United States contended that those practices primarily consisted of limited advertising and word-of-mouth referrals having a disparate impact

---

[13]The minority applicant pool for Exam No. 8609 was "too small to conduct statistical analysis." Jan. 10, 2005 Decl. of Charles E. Leggott, Ex. 26 (Dr. Bernard R. Siskin & Dr. Leonard A. Cupingood, Adverse Impact on Minorities of Written Examinations for Custodian and Custodian Engineer Positions in New York City (Nov. 1997)) at 2.

[14]"The standard deviation for a particular set of data provides a measure of how much the particular results of that data differs from the expected results." *United States v. New York City Bd. of Educ.*, 85 F. Supp. 2d 130, 142 n.17 (E.D.N.Y. 2000), *vacated*, 260 F.3d 123 (2d Cir. 2001).

on women and minorities.

In support of this claim, the United States relied on the expertise of Orley Ashenfelter, Ph.D. ("Dr. Ashenfelter"), who deduced that the numbers of black, Hispanic, Asian and female applicants for each exam were statistically less than those who would be expected to take the exam. Dr. Ashenfelter recognized that the relevant comparator group should be composed of those members of the labor pool who possessed the requisite qualifications to take the exam; however, because such data were nonexistent, Dr. Ashenfelter used prior work experience as a proxy for those qualifications: First, he identified the actual applicants' most common prior occupations, regardless of their race or gender, by reviewing their experience papers. He next used data prepared from the 1980 and 1990 decennial censuses by the Bureau of the Census ("Census Data") to calculate the fraction of those engaged in those common occupations in New York City who were members of each of the protected classes; although the Census Data did not include data on previous work experience, it did include data on occupations (as of the previous year), race, ethnicity, gender and place of work. Finally, he assumed that the expected fraction of the protected-class applicants was the average of their representation in these occupations weighted by the fraction of applicants who worked in these jobs. His results were as follows:

**Exam No. 5040**

|  | Estimated Representation in Labor Pool | Expected # of Applicants | Actual # of Applicants | Z-Statistic (# of Standard Deviations)[15] |
|---|---|---|---|---|
| Blacks | 24.9% | 439 | 341 | 5.41 |
| Hispanics | 24.9% | 439 | 218 | 12.16 |
| Asians | 3.2% | 56 | 15 | 5.61 |
| Females | 15.9% | 289 | 200 | 12.81 |

**Exam No. 8206**

|  | Estimated Representation in Labor Pool | Expected # of Applicants | Actual # of Applicants | Z-Statistic (# of Standard Deviations) |
|---|---|---|---|---|
| Blacks | 22.1% | 91 | 41 | 4.94 |
| Hispanics | 17.6% | 73 | 42 | 3.95 |
| Asians | 4.9% | 20 | 8 | 2.76 |
| Females | 9.4% | 40 | 4 | 6.01 |

---

[15]The Z-statistic is a dimensionless quantity that represents the number of standard deviations from which the actual score deviates from the mean score; it is derived by subtracting the mean score from the actual score and dividing the difference by the standard deviation. A Z-statistic greater than or equal to 1.96 means that there is only a 5% probability that the deviations were due to chance alone; statisticians refer to Z-statistics of 1.96 or more as statistically significant. *See* Decl. of Dr. Ashenfelter (Apr. 1, 1999) ¶ 19.

**Exam No. 1074**

|  | Estimated Representation in Labor Pool | Expected # of Applicants | Actual # of Applicants | Z-Statistic (# of Standard Deviations) |
|---|---|---|---|---|
| Blacks | 21.4% | 300 | 215 | 5.54 |
| Hispanics | 23.1% | 324 | 203 | 7.66 |
| Asians | 6.0% | 84 | 25 | 6.65 |
| Females | 14.7% | 209 | 71 | 10.34 |

Although Dr. Ashenfelder found a statistically significant disparity between the expected and actual number of applicants for each group and for each exam, he offered no opinion as to any cause for the disparities.

## B. The Settlement Agreement

Magistrate Judge Levy presided over pretrial proceedings, which commenced on October 3, 1997. As recounted by him, after "years of highly contentious discovery, entailing the retention of numerous experts by both sides, the production of thousands of pages of documents, the taking of approximately thirty depositions, many applications to the court regarding discovery disputes, and over three months of arms-length settlement negotiations[,]" *United States v. New York City Bd. of Educ.*, 85 F. Supp. 2d 130, 135 (E.D.N.Y. 2000), *vacated*, 260 F.3d 123 (2d Cir. 2001), the United States and the Board executed the Agreement on February 11, 1999, and jointly moved to enter it as a consent judgment.

The Agreement contains many provisions that are not in dispute, such as requiring the Board to implement a comprehensive recruitment plan designed to increase the number of black, Hispanic, Asian and female applicants for custodial

positions, *see* Agreement ¶18, and requiring the Board to consult with an expert designated by the United States before using written examinations to hire new custodial employees. *See id.* ¶28.

At issue are the remedies granted to the beneficiaries in Paragraphs 13-16. As of the date of the Agreement, a group of 54 individuals had been identified as blacks, Hispanics, Asians or white females eligible for relief, and were listed in Appendix A of the Agreement; they all had previously been hired as provisional employees and although 43 still were, 11 had, by that time, acquired permanent status.[16] The Agreement also offered relief to blacks, Hispanics, Asians and white females who might be hired as provisional custodial employees between the date of the Agreement and the date of anticipated court approval, provided they had taken one or more of the challenged exams; these individuals, together with those set forth in Appendix A, were defined in the Agreement as "Offerees." *See* Agreement ¶ 4.

Under Paragraph 13, all of the Offerees who were provisional employees would be granted permanent positions upon court approval of the Agreement.

Under Paragraphs 14-16, the Offerees were granted retroactive seniority. As for those listed in Appendix A, if the Offeree did not take any of the challenged exams, the retroactive seniority date was the date that he or she was provisionally hired; if the Offeree did take one or more of the challenged exams, the retroactive seniority date was the earlier of (1) the date he or she was provisionally hired, or (2) a "median

---

[16]Appendix A sets forth the race and ethnicity of each of the 54 – whether white, black, Hispanic or Asian – his or her gender, job title and seniority date.

date" for the exam.[17] For those who would be hired as Custodians after the Agreement, and hence were not listed in the Appendix, their retroactive seniority date would be the earliest provisional hire date for a Custodian listed in the Appendix (February 28, 1992); for those who would be hired as Custodian Engineers, their retroactivity seniority would date to the earliest provisional hire date in the Appendix for a Custodian Engineer (April 13, 1990). Furthermore, the Agreement provided that the award of retroactive seniority would "apply for all purposes for which seniority is applied except any applicable probation requirement." Agreement ¶ 14.

**C. The Impact of the Settlement Agreement on Seniority**

A custodial employee's seniority rights begin to accrue on the date of the employee's appointment to a permanent position. Of the four Brennan intervenors, Mortensen passed Exam No. 5040 and was appointed as a permanent Custodian on October 15, 1990. Brennan passed Exam Nos. 5040, 8206 and 1074, and was appointed as a permanent Custodian on or about March 24, 1997. Ahearn passed Exam Nos. 8206 and 1074, and was also appointed as a permanent Custodian on or about March 24, 1997. Spring passed Exam No. 1074 and was appointed as a permanent Custodian on June 23, 1997. Though Mortensen, Brennan and Ahearn were later appointed permanent Custodian Engineers, they retained the seniority rights that they had accrued as permanent Custodians.

---

[17]The median dates were January 23, 1989, for Custodian Exam No. 5040; October 8, 1992, for Custodian Engineer Exam No. 8206; February 14, 1992, for Custodian Engineer Exam No. 8609; and October 27, 1997, for Custodian Exam No. 1074. The median date is defined as the midpoint of the hiring period for the associated exam.

By contrast, the Offerees' seniorities, as reflected in Appendix A, ranged from January 23, 1989, to February 12, 1996 for Custodians, and from April 13, 1990, to June 28, 1996 for Custodian Engineers, even though at the time the Agreement was executed in early 1999, 43 Offerees were still provisional employees not accruing any seniority.[18]   By virtue of the Agreement, all Offerees have greater seniority than Brennan, Ahearn and Spring, and 16 have greater seniority than Mortensen; consequently, as now explained, the Brennan intervenors' rights to school building transfers, temporary care assignments, and layoff protection have been adversely impacted.

**1. School Building Transfers**

The Board periodically affords permanent custodial employees the opportunity to bid for a transfer to an open school building by distributing to them a list of the schools that have vacancies; in the two years after the Board implemented the Agreement, it issued six such lists.   A custodial employee's salary depends on the school building to which he or she is assigned; therefore, a transfer may equate to a salary increase.[19]

---

[18]Appendix A does not reflect the date that the 11 Offerees that had already become permanent employees by the time the Agreement was executed began accruing seniority.

[19]For each school, the Board assigns a "management fee" that reflects the appropriate cost for custodial services in that particular school, including the salary of the custodial employee.  From this management fee, the custodial employee assigned to the building may earn up to the "maximum permissible retainage" for the employee's building.  If, however, the custodial employee goes over budget, the employee's salary is reduced.

The collective bargaining agreement ("CBA") between the Board and the custodial employees' union provides that transfers are governed by a combination of seniority and performance ratings. With limited exceptions, all permanent custodial employees are eligible to bid for a transfer to a different school upon completion of a one-year probationary period. Custodians and Custodian Engineers are separately divided into seniority bands.[20] The custodial employee in the highest seniority band, provided that he or she has the requisite licensure for that particular school, is awarded the transfer. However, when there is more than one custodial employee in that seniority band, the one with the higher performance rating – defined as the average of the principal's ratings over the preceding two years – will receive the transfer unless the rating differential is equal to or less than a quarter point; in that case, the one with the most seniority will be awarded the transfer unless the school's principal vetoes the candidate or the candidate has received a performance rating of less than three.

The CBA provides that "[s]eniority of all candidates shall be determined solely by time served [as a permanent employee] together with time served in the predecessor title for that level [as a permanent employee,]" CBA at 23-24; for example, an employee who served five years as a Custodian and ten years as a Custodian Engineer Level 1, the new title for Custodians, would have fifteen years of seniority.

---

[20]There are three seniority bands for Custodians (one to five years, five to ten years, and ten or more years); there are four seniority bands for Custodian Engineers (one to five years, five to ten years, ten to fifteen years, and fifteen or more years).

## 2. Temporary Care Assignments

The Board has a practice for filling temporary vacancies caused by illness, vacation or leave through Temporary Care Assignments ("TCA") to custodial employees. Under the TCA program, a custodial employee is assigned to an additional school to attend to such vacancies; the employee then divides his or her time between the two schools (without having to work additional hours) and collects a portion of the management fee for the second school. The process for awarding TCAs is not set forth in the CBA.

To be eligible for a TCA, a custodial employee must have attained permanent-employee status and completed the one-year probationary period. Each borough maintains three lists of those eligible for TCAs: one for Custodian Engineers, one for Custodians and one for Custodians with fifteen or more years of seniority. Eligible custodial employees are placed on the applicable TCA list for the borough in which they work in the order that they completed their probationary periods; therefore, placement on a TCA list typically correlates with the date an employee is appointed as a custodial employee, given that the date of completion of the probationary period occurs one year after the employee's start date.[21]

When a temporary vacancy arises, the Board offers the TCA to the custodial employee who is at the top of the applicable list. After the completion of the

---

[21]Custodian Engineers who previously served as Custodians *and* completed a one-year probationary period under that title do not have to serve a second probationary period; thus, those individuals are placed on the applicable TCA list immediately upon appointment as a permanent Custodian Engineer.

TCA, the employee is placed on the bottom of the list. On average, an opportunity for a TCA arises once every two years and, on average, each TCA lasts two months.

The award of permanent-employee status had a nominal effect on the Brennan intervenors since it increased the number of custodial employees on the TCA lists, thereby reducing the frequency with which a custodial employee obtains a TCA.[22] Additionally, it affected the relative placement on the list of Mortensen, who was appointed as a permanent Custodian Engineer *after* the beneficiaries completed their one-year probationary periods.[23] *See* Brennan Intervenors' Reply Mem. of Points & Authorities in Further Support of their Motion for Partial Summary Judgment at 31 n.11 ("The Brennan Intervenors do not dispute that the Offerees should not lose their jobs."); October 6, 2005 Oral Argument Tr. at 13 ("MR. ROSMAN: It does come down to

---

[22]It is unclear *where* on the TCA list the beneficiaries were placed. According to James Lonergan, formerly the Board's Senior Director of Building Services, the beneficiaries who were awarded permanent-employee status were placed at the bottom of the applicable TCA list only after they completed the one-year probationary period; the beneficiaries who were already permanent employees as of the date that the Agreement was implemented remained on the applicable TCA list according to date that they completed their probationary periods (i.e., their relative positions on the TCA lists were not moved up to reflect any retroactive seniority received under the Agreement). However, according to Salvatore Calderone, the Board's Deputy Director for the Office of Building Services, the beneficiaries who were awarded permanent-employee status were placed on the top of the applicable list when they became eligible, and the beneficiaries who were already permanent employees were placed on the top of the list once the Agreement was implemented.

[23]The award did not affect Ahearn or Brennan, even though they, too, were appointed as permanent Custodian Engineers after the beneficiaries were awarded permanent-employee status. Ahearn and Brennan were appointed as permanent Custodian Engineers on October 18, 2000, and because they had previously completed one-year probationary periods as Custodians, were immediately placed on the applicable TCA list – before the beneficiaries completed their one-year probationary periods.

seniority, yes. The retroactive seniority agreements were not the only provisions that affected our seniority, our relative seniority.").

## 3. Layoffs

The New York Civil Service Law provides that layoffs of custodial employees are made "in the inverse order of original appointment on a permanent basis," N.Y. Civ. Serv. L. § 80(1); a Custodian with more seniority has precedence over, and would be laid off later than, a Custodian Engineer with less seniority. Furthermore, the date of original appointment is the date that an individual is appointed to a permanent position provided that he or she provides "continuous service" in that position, *see id.* § 80(2) (defining "original appointment" as "the date of [the employee's] first appointment on a permanent basis . . . followed by continuous service . . . on a permanent basis"); one who serves as a provisional employee nonetheless provides "continuous service" when he or she served in a permanent position immediately before and after. *See id.* ("[A] period of employment on a . . . provisional basis . . . immediately preceded and followed by permanent service . . . shall not constitute an interruption of continuous service[.]"). Accordingly, for those Custodian Engineers who previously served as Custodians, their dates of original appointment are the dates that they were appointed as Custodians – not the later appointments as Custodian Engineers. *See* Arroyo Ex. 83 (Gladstein Dep. Tr.) at 31-32.

The New York Civil Service Law speaks in terms of "permanent appointment," not "seniority." The parties, however, citing the language in the Agreement providing that the award of retroactive seniority applies for all purposes for

which seniority plays a role, all agree that the award of retroactive seniority constructively altered the date of original appointment of the beneficiaries.[24]

## D. The Fairness Hearing and Magistrate Judge Levy's Memorandum and Order

Paragraph 34 of the Agreement required the parties to request the Court to conduct a "fairness hearing" to consider all objections to the Agreement and "resolv[e] all disputes regarding the proposed conversion of Offerees from provisional to permanent status and granting of retroactive seniority, so that the Settlement Agreement may be entered by the Court."[25]  On March 4, 1999, the Court authorized Magistrate Judge Levy to conduct the hearing, *see United States v. New York Bd. of Educ.*, CV-96-374 (E.D.N.Y. Mar. 4, 1999), which took place on May 27, 1999.  On June 2, 1999, the parties, pursuant to 28 U.S.C. § 636(c), conferred jurisdiction on the magistrate judge to render a final judgment.

Prior to the hearing, the parties published notice of the Agreement in various newspapers and provided actual notice of the Agreement to more than 2,000 individuals, advising that any objections had to be filed by April 27, 1999.  The notices resulted in objections by over 300 individuals, as well as a motion to intervene pursuant

---

[24]In a Memorandum and Order dated June 23, 2006, the Court afforded the parties the opportunity to submit letter memoranda regarding the interplay between the New York Civil Service Law and the Agreement as it concerned layoffs.  Each party responded on July 17, 2006.

[25]A fairness hearing provides interested parties an opportunity to object; if after notice and opportunity to object, a consent judgment is issued, these interested parties cannot collaterally attack the settlement agreement.  *See* 42 U.S.C. § 2000e-2(n) (individuals may not challenge any employment practice implementing a consent judgment provided notice and opportunity to object are given).

to Fed. R. Civ. P. 24(a) by the Brennan intervenors.

In a comprehensive decision rendered on February 9, 2000, Magistrate Judge Levy approved the Agreement and entered it as a consent judgment. *See New York City Bd. of Educ.*, 85 F. Supp. 2d at 133. Recognizing that "voluntary settlements in Title VII cases enjoy a presumption of validity," especially "when the consensual agreement at issue has been reached by a federal government agency charged with protecting the public interest and seeing that anti-discrimination laws are enforced and violations remedied[,]" *id.* at 137, the magistrate judge identified the standard of review as "whether the proposed agreement is lawful, fair, reasonable, adequate, and consistent with the public interest," *id.* at 136 (citing *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985), and *Vulcan Soc'y v. City of New York*, 96 F.R.D. 626 (S.D.N.Y. 1983)), adding that where, as here, a settlement agreement implements race-conscious remedies, "the court reviewing the settlement must determine whether (1) there is an existing condition that serves as a proper basis for the creation of race-conscious remedies; and (2) the specific remedies of the compromise agreement are reasonable and lawful." *Id.* (citing *Kirkland v. New York State Dep't of Corr. Servs.*, 71 F.2d 111 (2d Cir. 1983)).

Statistically significant disparities led Magistrate Judge Levy to conclude that the United States had established a *prima facie* case of disparate-impact discrimination for each of the three exams, as well as for the recruitment for the exams. With respect to the testing claims, Magistrate Judge Levy set forth, for each exam, the pass rates of whites, blacks and Hispanics in the relevant labor market, and then found

the differences in the pass rates for blacks and Hispanics, as compared to whites, to be statistically significant. With respect to the recruiting claim, Magistrate Judge Levy relied upon Dr. Ashenfelter's "undisputed" and "unrebut[ted]" report. *See id.* at 143-45.

Next, Magistrate Judge Levy determined that the Agreement was fair and reasonable since it averted "a complex, expensive, and lengthy trial[,]" *id.* at 146, and because the retroactive-seniority provisions were "entirely consistent with and clearly m[et] Title VII's objective of eradicating discrimination." *Id.* at 147. In that latter regard, he reasoned:

> [T]he relief is narrowly tailored, as only persons who are qualified for the positions of Custodian and Custodian Engineer will receive remedial relief, and no current permanent employee will be displaced. Indeed, the number of Offerees who will receive permanent positions is quite small in comparison with the number of individuals who may have been afforded relief had this matter proceeded to final adjudication. Plus, the Agreement does not establish any permanent numerical requirements or quotas; once the Offerees are converted to permanent status with retroactive seniority, the defendants will be required to recruit minority and female candidates actively and to hire on a non-discriminatory basis, but will not be required to achieve or maintain any specific percentage of minorities or women in the relevant workforce.

*Id.* at 147.

Magistrate Judge Levy rejected the objections by "current permanent employees who allege[d] that retroactive seniority for the Offerees may adversely affect their relative seniority rights . . . ." *Id.* at 147. In doing so, he relied on Dr. Siskin's "unchallenged" opinion that the granting of retroactive seniority would have, at worst, a "limited" economic impact on custodial employees; the magistrate judge concluded,

therefore, that "the impact of this relief on the incumbent [custodial employees] w[ould] be minimal and dispersed, and [thus,] the remedy [was] unquestionably legal and reasonable." *Id.* at 149-51.

Additionally, Magistrate Judge Levy denied the proposed Brennan intervenors' intervention motion, rejecting their argument that they had an absolute right to intervene because they were adversely affected by the Agreement. The crux of his reasoning was his belief that the Offerees were basically being restored to the employment rights they would have enjoyed if not for the Board's unlawful discriminatory practices. *See id.* at 155.

Following Magistrate Judge Levy's approval, the Board notified 63 Offerees that they were entitled to relief under the Agreement.[26] Each Offeree had the option to consent to the Agreement or to pursue claims against the Board by withholding consent. *See* Agreement ¶40. Fifty-nine of the Offerees consented, one declined, and three resigned. *See* Dec. 23, 2004 Decl. of Emily Martin, Ex. 54 (Apr. 8, 2002 Decl. of James Lonergan) ¶7. According to a "Relief Chart" prepared by the United States, 31 of the accepting Offerees were awarded relief under the recruiting claim; of that group, 12 received relief based on race or national origin, and 19 based on gender. *See* Nov. 15, 2004 Statement of Michael E. Rosman, Ex. 54 (Relief Chart for

---

[26]While the Appendix listed 54 potential beneficiaries, other custodial employees sought to obtain benefits under the Agreement after it was executed. Seven (Joseph Christie, Jerry Dale Lewis, Anthony Pantelides, Nicholas Pantelides, Percival Punter, Gilbert Rivera and Harry Santana) were added as beneficiaries because, although originally listed as white in the Board's records, each claimed to be either black or Hispanic. The United States and the Board added these seven, together with two others (Kevin LaFaye and Vernon Marshall), bringing the total number of beneficiaries to the final number of 63.

United States Response to Contention Interrogatories) ("Relief Chart").[27] The remaining 28 were awarded relief under the testing claims, all based on their race or national origin. *See id.*

The Board awarded the consenting Offerees relief under the Agreement on the dates that it received the Offerees' acceptances, which ranged from February 22 to March 14, 2000; thus, accepting Offerees who were still provisional employees received permanent-employee status sometime in between those two dates. *See id.*, Ex. 50 (U.S. v. Board of Ed. Relief Granted). The Board thereafter fully implemented the Agreement.

**E. The Second Circuit's Remand**

The proposed Brennan intervenors appealed the denial of their intervention motion. On August 3, 2001, the Second Circuit vacated Magistrate Judge Levy's consent judgment, holding that the proposed Brennan intervenors' intervention motion should have been granted. *See New York City Bd. of Educ.*, 260 F.3d at 129. In doing so, it noted that "where a proposed intervenor's interests are otherwise unrepresented in an action, the standard for intervention is no more burdensome than the standing requirement, and that appellants' interest in the underlying action and the Agreement is for purposes of standing identical to that of the Offerees." *Id.* at 131 (citation omitted).

---

[27]Of the 19 women receiving relief, 16 are identified in the Relief Chart as white, one (Celia Calderon) as Hispanic, one (Marcia Jarrett) as black and one (Kim Tatum) as Asian. These last three are not included in the number of beneficiaries receiving relief under the recruiting claim based on race or national origin; thus, the 12 receiving relief on those grounds are all men.

Commenting that the magistrate judge's ruling had "put the cart before the horse" by holding that the proposed Brennan intervenors' interest was insufficient because their employment status and seniority rights "were *presumptively* obtained as the result of discriminatory practices[,]" *id.* at 129 (emphasis added), the court explained that "while the presumption of validity of a settlement agreement may shift the burden of showing invalidity [of the Agreement] to non-party objectors, it carries no weight in the determination of whether an interest is sufficient for intervention under Rule 24(a)." *Id.* at 129-30. In that regard, the circuit court explained that Rule 24(a) "requires not a property interest but, rather, 'an interest relating to the property or transaction which is the subject of the action[,]'" *id.* at 130 (quoting Rule 24(a)(2)), and held that the proposed Brennan intervenors possessed such an interest because they claimed that the Agreement was "not justified by any demonstrated past discrimination and that their loss of relative seniority as a result of the Agreement is itself impermissible discrimination." *Id.* at 130.

The circuit court also noted that the proposed Brennan intervenors' interest in their seniority was "cognizable under Rule 24(a)(2)" because "the effects of a loss of relative seniority rights should not be regarded as too speculative and remote to justify intervention save, perhaps, in a case where a concrete effect on an employee is impossible." *Id.* at 131-32. The court explained, as an example, how seniority would adversely affect the proposed Brennan intervenors' ability to transfer:

> If a [Beneficiary] obtains a desirable transfer, all comparable employees with more seniority than [a Brennan intervenor] but less than that of the [Beneficiary] may seek transfers at the next level of desirability, thereby foreclosing the

particular appellant. The effects of the loss of relative seniority are not easily forecast and may not even be perceived as they happen. To take an alphabetical example, if employee Z is moved up to just above employee A, then the effects of that move on employee T will turn on the preferences of employees A through S. Where transfers among buildings are concerned, size (and therefore salary) will be important in determining whether an employee will exercise seniority to seek a transfer, but some employees will also be motivated by other factors, such as location. If employee Z secures a transfer, a chain reaction will begin with various openings and transfers occurring based on a variety of decisions by A through S. After all is played out, employee T may well find it impossible to reconstruct what transfer might have been available to him/her but for the moving-up of employee Z.

*Id.* at 132.

The circuit court declined to rule on the merits of Magistrate Judge Levy's consent judgment because the proposed Brennan intervenors had "argued convincingly that they were denied the opportunity to develop a record that would have permitted a full and appropriate ruling on the fairness and constitutionality of the Agreement." *Id.* at 133.[28] Accordingly, the court acknowledged that "the best course [was] to remand the case to allow for a full development of the record." *Id.*

---

[28]As the circuit court also noted, "at least one reason the declarations were unrebutted and unchallenged was that they were served some weeks after objections were due and only days before the fairness hearing. In fact, one declaration was sent to the court via Federal Express only two days before the hearing." *Id.* at 130 n.4.

**F. The Post-Remand Interventions**

**1. The Brennan Interventions**

After the case was remanded, the Brennan intervenors, now having attained that status as a consequence of the circuit court's decision, filed a complaint in intervention asserting that the challenged provisions violated Title VII and the Fourteenth Amendment; the United States and the Board moved to dismiss the complaint. On February 28, 2002, before that motion was fully briefed, Magistrate Judge Levy, with consent from the United States, the Board and the Brennan intervenors, approved the Agreement except for the challenged provisions (i.e., Paragraphs 13-16).

Subsequently, Magistrate Judge Levy noted that the Brennan intervenors had maintained that "they ha[d] no intention of attempting to establish liability against any party . . . and that they d[id] not . . . seek any remedy in this case other than a judgment denying approval of [the challenged provisions]"; consequently, he ruled that "[t]o the extent that [the Brennan intervenors' complaint in intervention] could be interpreted as asserting legal claims against any party, they are stricken" and that "[t]he Intervenors' pleading w[ould] be redesignated as 'Objections in Intervention,' and . . . w[ould] not require a responsive pleading from either the United States or the [Board]." *United States v. New York City Bd. of Educ.*, CV-96-374, slip op. at 11-12 (E.D.N.Y. Sept. 30, 2002). The Brennan intervenors timely objected to Magistrate Judge Levy's ruling; they also invoked their rights as parties to the action to object to the magistrate judge's

jurisdiction to render a final determination, thereby placing the litigation back in the hands of the Court.

**2. The Caldero and Arroyo Interventions**

In April 2002, subsequent to the Second Circuit's remand, the United States decided that it would no longer defend the lawfulness of the Agreement's remedies for those beneficiaries who had not taken any of the challenged exams. On June 17, 2003, the parties entered into a stipulation, "so ordered" by the Court, permitting intervention by the Caldero intervenors, being "a group of 22 beneficiaries who received permanent appointments and/or retroactive seniority under the Agreement pursuant to the United States' recruiting claim." United States' Mem. of Points and Authorities in Response to this Court's Order of July 20, 2004 ("United States Mem. of Law") at 6. Then, in September 2003, the United States decided that it would no longer defend the grant of retroactive seniority provided to the beneficiaries who took and failed the exams unless it was "make-whole" in nature. The Court consequently granted intervention to the Arroyo intervenors, *see* Minute Entry of Jul. 9, 2004, "a group of nine beneficiaries who received permanent appointments and/or retroactive seniority under the Agreement pursuant to the United States' testing claim." United States' Mem. of Law at 6.

**G. Post-Remand Challenges By The Brennan Intervenors**

**1. Challenges to the Reputed Protected Class**

According to the Brennan intervenors, four of the beneficiaries – Kevin LaFaye, Steven Lopez, and brothers Anthony and Nicholas Pantelides – were not Hispanic because, although they had at least one parent or grandparent of Hispanic

origin, they lacked any strong cultural or linguistic ties to that group. Additionally, the Brennan intervenors contended that Ciro Dellaporte ("Dellaporte"), one of the 12 males who received relief under the recruiting claim, was not a member of any protected class; although identified as Hispanic in the Board's records, Dellaporte was of Italian ancestry and had no cultural or linguistic ties to a Spanish-speaking country.

LaFaye's father was born in Puerto Rico, as was the mother of the Pantelides brothers; one of Lopez' grandparents was born in Mexico. None of the four spoke Spanish; however, Spanish was spoken in LaFaye's childhood home and the Pantelides brothers' mother generally spoke Spanish to their maternal grandmother.

By contrast, none of Dellaporte's parents or grandparents was born in a Hispanic country; moreover, he never identified himself as Hispanic. Eventually, the Board realized that Dellaporte was not entitled to relief under the Agreement. *See* Defs.' Mem. of Law in Opp. to Brennan Intervenors' Objections at 63 n.26 ("Defendants do not defend [Dellaporte's] appointment as part of the remedy in this case.").

### 2. Challenges to the Testing Claims

### a. Proof of Discrimination

The Brennan intervenors concede that Exam Nos. 5040 and 1074 had a disparate impact on blacks and Hispanics. They further concede that Exam No. 8206 had a disparate impact on blacks. They dispute, however, that it had a disparate impact on Hispanics; if correct, Luis Torres, the one Hispanic allegedly adversely affected by that exam, *see* Relief Chart, should not have received any relief.

The Brennan intervenors' challenge regarding Exam No. 8206 was based on the opinion of Dr. Phillip Bobko ("Dr. Bobko"), an expert retained by the Board at a time when it was disputing the United States' claims. According to Dr. Bobko, there was not a statistically significant disparity for Hispanics on Exam No. 8206 when unqualified test-takers (i.e., those who lacked the minimum qualifications based on a review of the applicants' experience papers) were removed from the population. Because the Board initially made qualification determinations only for test-passers, Dr. Bobko had to derive the number of unqualified test-failers based on data generated from a post-hoc review conducted by the Board.[29] Dr. Bobko calculated that when unqualified test-takers were removed, the pass rate of Hispanics was 89.3% of the pass rate of whites.[30]

Drs. Siskin and Cupingood opined that the Board's post-hoc review was not a "credible" basis for determining which test-takers were unqualified because, unlike test-passers, test-failers could not administratively appeal an adverse determination. Jan. 10, 2005 Decl. of Charles E. Leggott, Ex. 22 (Drs. Siskin and Cupingood's May 1, 2003 Comments on Dr. Scharf's Report) at 4. Instead, Drs. Siskin and Cupingood calculated pass rates for a population composed of qualified test-

---

[29]The post-hoc review mirrored the review of the test-passers in all respects except that it did not include an opportunity for applicants to administratively appeal an adverse determination; of the 56 test-passers initially determined to be unqualified, 23 overturned that determination through the appeals process.

[30]According to Dr. Bobko, of 257 qualified white test-takers, 232 passed the exam, resulting in a pass rate of 90.3%; of 31 qualified Hispanics, 25 passed, resulting in a pass rate of 80.6%. *See* Dr. Philip Bobko, Adverse Impact (If Any) Analysis for Open Competitive Engineer Exam #8206 (Nov. 12, 1997). Thus, the pass rate for Hispanics was 89.3% of the pass rate for whites.

passers (since the number of unqualified test-passers was known) and all test-failers (since the number of unqualified test-failers was unknown); for this population, the pass rate of Hispanics was 77.7% of the pass rate of whites, a disparity of 2.51 standard deviations.

In addition, Drs. Siskin and Cupingood calculated pass rates based on three alternative assumptions: (1) the percentage of unqualified test-failers equaled the percentage of unqualified test-passers; (2) the percentage of unqualified test-failers was twice the percentage of unqualified test-passers; and (3) the percentage of unqualified test-failers was three times the percentage of unqualified test-passers. Given those assumptions, the pass rate of Hispanics was, respectively, 82.5%, 88.4%, and 95.2% that of whites, resulting in disparities of between 1.95 and 0.37 standard deviations.

### b. Non-Victims of Discrimination

The Brennan intervenors acknowledge that seven of the beneficiaries were victims of discrimination under the testing claims and received appropriate make-whole relief: Lloyd Bailey, Joseph Christie, Belfield Lashley, Gilbert Rivera, Peter Robertin, Felix Torres and Mayra Zephrini (Cintron). They contend, however, that the beneficiaries that fall into the following categories received relief under the Agreement that went beyond what they would have received but for discrimination:

First, some of the beneficiaries who were afforded relief under the testing claim took and *passed* one of the challenged exams, but failed other parts of the hiring process. For example, the Brennan intervenors claim that Nicholas Pantelides passed the challenged exam but failed the associated practical exam, and that Stephen Lopez

passed the challenged exam but was rejected as a result of his experience papers. If true, these individuals would not qualify as victims of discrimination because they passed the exam that allegedly discriminated against them.

Second, some black and Hispanic beneficiaries who were afforded relief under the testing claims passed the first challenged exam that they took, and were hired. If so, those individuals would not be victims of discrimination because they passed the exam that allegedly discriminated against them; furthermore, the Brennan intervenors contend that awarding them retroactive seniority to a date earlier than their date of hire put them in a position *better* than they would have been in but for discrimination.

Third, some of the beneficiaries who were afforded relief under the testing claims would have failed other parts of the hiring process even if they had passed the exam. This contention was based on the Board's post-hoc inquiry of the beneficiaries' qualifications.[31] Awarding relief to individuals who would have failed other parts of the hiring process would go beyond make-whole relief because it would put them in positions *better* than they would have been in but for the discrimination.

Finally, some of the beneficiaries were awarded retroactive seniority from the date they were hired as provisional hires, as opposed to the median hire date, even though their provisional hire date occurred before any individual was hired from the

_____

[31]The following beneficiaries, each of whom failed one of the challenged exams, were found in a post-hoc review to lack the minimum qualifications set forth in the notice publicizing the applicable exam: for the 5040 exam, Laura Daniele, Thomas Fields, Carla Lambert, Angel Pagan, Anthony Pantelides, Kim Tatum and Pedro Arroyo; for the 8206 exam, Luis Torres; and for the 1074 exam, Charmine DiDonato, Elaine Farr, Carla Lambert, James Martinez and Kim Tatum.

eligibility list for the discriminatory exam. For example, the Brennan intervenors contend that Jose Casado took and failed Exam No. 1074, but was hired as a provisional Custodian on June 16, 1995; the first person hired off the list associated with Exam No. 1074 had a reporting date of March 27, 1997 (almost two years after Casado was hired); nonetheless, Casado was afforded relief under the testing claims, and received a retroactive seniority date of June 16, 1995 – before he could have been hired but for discrimination (i.e., March 27, 1997). If true, awarding such relief put those individuals in positions *better* than they would have been in but for discrimination.[32]

### 3. Challenges to the Recruiting Claim

### a. Proof of Discrimination

After the circuit court's remand, the Brennan intervenors retained their own expert, William J. Carrington, Ph.D. ("Dr. Carrington"), to review Dr. Ashenfelter's report. In Dr. Carrington's report, he noted that there were two alternative explanations for the disparity found by Dr. Ashenfelter: (1) the significant minimum qualifications required (e.g., females were significantly under-represented in the occupations that Dr. Ashenfelter identified as the most common ones among applicants), and (2) different interests in Custodial Positions; he also noted that Dr. Ashenfelter did not account for English-language proficiency. Additionally, Dr. Carrington posited that the statistics might not be reliable because of the small sample size of the census data for certain

---

[32]The United States also challenges the award, at least in part, as reflected in its Relief Chart. It contends that 15 beneficiaries were entitled to less retroactive seniority than afforded by the Agreement, and that two were entitled to more. It also contends, for various reasons that need not be detailed here, that 25 beneficiaries are not entitled to any retroactive seniority. Finally, it contends that the appropriate remedy for beneficiary Elaine Farr is unknown.

occupations, as well as temporal mismatches (i.e., the decennial census data yielded only data from 1980 and 1990 whereas Dr. Ashenfelter required data from the non-census years in which the challenged exams were administered – 1985, 1989 and 1993).

Thereafter, the Board retained an expert, Amy Henderson, Ph.D. ("Dr. Henderson"), to review Dr. Carrington's report. Dr. Henderson noted that Dr. Carrington did not "offer [any] new statistical evidence" and "never test[ed] the implications of his criticisms." Dec. 23, 2004 Decl. of Emily Martin, Ex. 34 (A Critique of William J. Carrington's Report of Findings) at 2. For example, with regard to Dr. Carrington's claim that English proficiency might have accounted for the discrepancy between actual and expected test-takers, Dr. Henderson tested that claim against the data for Exam No. 8206 and found that English proficiency was not a significant factor.

The Caldero intervenors also retained an expert, Joyce P. Jacobsen, Ph.D. ("Dr. Jacobson"), to review the reports of Drs. Ashenfelter and Carrington. Dr. Jacobsen concluded that Dr. Ashenfelter's approach was "reasonable" because it used the best available data, and that the results were "statistically significant[,] supporting the hypothesis of a systematic shortfall in the proportions of minorities and women applying for [custodial positions]." Dec. 14, 2004 Decl. of Joyce P. Jacobsen ¶ 12; id., Ex. 1 at 2. With regard to Dr. Carrington's report, like Dr. Henderson, Dr. Jacobsen concluded that it was "unconvincing and d[id] not provide alternative calculations." Id. ¶ 12.

In addition to challenging the statistical evidence of disparities, the Brennan intervenors also argue that there was no evidence that the disparities were

caused by the Board's recruiting practices. In this regard, they rely on information provided by the Board during discovery: Each exam was published in *The Chief*, the City's civil-service newspaper. In addition, the Board's Office of Recruitment distributed "Exam for Jobs" booklets to agencies and organizations on its mailing lists; during the relevant time periods, the list comprised 1,300 to 3,000 persons and organizations, including "libraries, colleges, high schools, community-based organizations, community boards throughout [New York] City, human resources administrations, Training Assessment and Placement centers, organizations serving the disabled communities such as the Federation of Employment and Guidance Services, certain trade schools, and youth organizations throughout the City such as YMCA and Boys Clubs." Nov. 15, 2004 Statement of Michael E. Rosman, Ex. 26 (Defs.' Responses and Objections to the Caldero Intervenors' First Interrogatories to Defs.) at 4. The Board also posted notices within its own agencies. *See id.*, Dep. Exs. (Rosenfeld Dep. Tr. at 13, 33-34).

### b. Non-Victims of Discrimination

The Brennan intervenors maintain that some of the Asian and female beneficiaries who were afforded relief under the recruiting claim took the first challenged exam for which they were qualified. They reason that those individuals who learned about the first exam and took it did not suffer from any recruiting discrimination; those individuals who took the first exam for which they were qualified, but received retroactive seniority to an earlier date, were awarded relief that went beyond make-whole relief because it put them in positions *better* than they would have

been in but for discrimination.

**H. Issues Briefed**

On July 20, 2004, the Court issued an order setting a briefing schedule and instructing the parties to address four issues:

> (1)    Can paragraphs 13-16 of the settlement agreement be entered as a consent judgment?
>
> (2)    If so, what legal standard governs judicial approval or disapproval of paragraphs 13-16?
>
> (3)    If not, what legal standard governs the review of the legality of the benefits awarded pursuant to paragraphs 13-16?
>
> (4)    Does the evidence meet the applicable standard?

Order of Jul. 20, 2004, at 2. These issues were fully briefed by May 2005, and the Court held oral argument on October 6, 2005.

## DISCUSSION

### Preliminary Matters

**A. Brennan Intervenors' Status**

Magistrate Judge Levy improperly relegated the Brennan intervenors to the status of objectors-in-intervention, rather than parties to the litigation, and re-designated their complaint as "Objections in Intervention"; therefore, he ruled that responsive pleadings would not be required. Given that the Brennan intervenors seek to enjoin the implementation of those parts of the Agreement affecting their seniority rights, and the circuit court's recognition that they had standing to do so, they are entitled to the status of full, unqualified parties to the litigation. *Cf. McNamara v. City of*

*Chicago*, 138 F.3d 1219, 1221 (7th Cir. 1998) ("A plaintiff who would have been no better off had the defendant refrained from the unlawful acts of which the plaintiff is complaining does not have standing under Article III of the Constitution to challenge those acts in a suit in federal court.").[33]

**B. Effect of the Summary Judgment Motions on Action II**

That the United States and the Board have not until now had an opportunity to interpose an answer to the Brennan intervenors' complaint does not preclude the Court from addressing the legality of the Agreement; the parties have moved for summary judgment regarding its validity, and it is well-settled that issue need not be joined as a predicate for seeking summary judgment. *See* Fed. R. Civ. P. 56 ("A party seeking to recover upon a claim . . . may, *at any time after the expiration of 20 days from the commencement of the action . . .* , move . . . for a summary judgment in the party's favor upon all or any part thereof." (emphasis added)).

Even though the summary judgment motions are directed only to Action I, the focused issue they address – the legality of the Agreement – is common to

---

[33] None of the Brennan intervenors has yet suffered any actual adverse consequences since they have not been denied transfers (unlike the two white males in Action II) or TCAs, and have not been laid off; nevertheless, their claims are ripe for adjudication. *See Benson v. General Motors Corp.*, 716 F.2d 862, 864 (11th Cir. 1983) (holding that for purposes of statute of limitations, claim accrues from injury, which is the loss of seniority, not when one "became aware of one of the injury's many manifestations"); *Anderson v. Legal Aid Society*, 1995 WL 322182, at *3 n.5 (S.D.N.Y. May 26, 1995) ("Although plaintiffs have not been terminated or threatened with future layoffs, they have suffered a legally cognizable injury because they lost bargaining unit-seniority . . . ." (citing *Benson*, 716 F.2d at 864)); *see also Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 569-72 (1984) (striking down court order because "unless set aside [the order] must be complied with in connection with any *future* layoffs." (emphasis added)).

both actions, which have been consolidated under Fed R. Civ. P. 42(a). The central purpose of that rule is to give the court broad discretion to manage its docket "so that the business of the court may be dispatched with expedition and economy while providing justice to the paries." 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2381 (2d ed. 1995). The Court will exercise that discretion since resolution of the summary judgment motions in Action I applies with equal force to Action II; it will also best serve the interests of all parties, as well as the effective and expeditious administration of justice, to facilitate the end of this decade-long litigation.

## C. Protected Class

The Brennan intervenors claim that five of the 59 beneficiaries are not members of a protected class because each lacks the requisite cultural or linguistic ties to qualify as Hispanic.

The Economic Employment Opportunity Commission ("EEOC") "defines national-origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, *or* his or her ancestor's, place of origin; *or* because an individual has the physical, cultural or linguistic characteristics of a national origin group," 29 C.F.R. § 1606.1 (emphasis added); therefore, an ancestral place of origin is sufficient to establish membership in a protected class.

Under the EEOC's definition of national origin, Dellaporte did not qualify because the Board, which no longer defends his appointment, improperly listed him on its records as Hispanic; plainly, he is of Italian ancestry and has no Hispanic cultural or linguistic ties. He is, therefore, not entitled to any benefits under the Agreement.

However, the remaining four – LaFaye, Lopez and the Pantelides brothers – do qualify because LaFaye's father and the Pantelides' mother were born in Puerto Rico, and Lopez's grandfather was born in Mexico.[34]

## Title VII

Consistent with the doctrine of constitutional avoidance, the Court will first determine whether the Brennan intervenors' Title VII rights have been violated before addressing their Fourteenth Amendment claims. *See Bechtel v. Competitive Technologies, Inc.*, 448 F.3d 469, 476 (2d Cir. 2006) ("A fundamental and long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." (citations and quotations omitted)).

### A. Statistical Basis For the Affirmative-Action Plan

Both disparate treatment and disparate impact claims are cognizable under Title VII. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971) (explaining that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation"); *Robinson v. Metro-North Commuter RR Co.*, 267 F.3d 147, 160 (2d Cir. 2001) ("[W]here the inquiry in a pattern-or-practice disparate treatment claim is focused on determining the existence of discriminatory intent,

_____

[34]The Brennan intervenors cite *Peightal v. Metropolitan Dade County*, 26 F.3d 1545 (11th Cir. 1994), for the proposition that "a person's claim of identification with a certain racial or ethnic group should accompany strong visible indication that the person culturally and linguistically identifies with the group he or she claims." *Id.* at 1559. *Peightal* is inapposite because, in determining that these contested beneficiaries qualified as Hispanic, the Board relied on proof of their places of origin, not merely their "claims of identification."

disparate impact claims are concerned with whether employment policies or practices that are neutral on their face and were not intended to discriminate have nevertheless had a disparate effect on the protected group.").

By pursuing its Title VII disparate-impact claims against the Board, the United States had the burden of establishing a *prima facie* case that the Board engaged in "a particular employment practice that cause[d] a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). To make that showing, it had to "(1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two." *Robinson*, 267 F.3d at 160. A disparate impact and its causal relationship to an employment practice is usually established by statistical evidence, which (1) must reveal "that the disparity is substantial or significant," and (2) must be "of the kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity." *Id.* (citations omitted). The employer can rebut that *prima facie* burden "by introducing evidence to show that either no statistically significant disparity in fact exists or the challenged practice did not cause the disparity." *Id.* at 161. Alternatively, it may refute the requisite causal connection by "demonstrating a business justification for the policy or practice." *Id.*

Seeking to satisfy its *prima facie* burden in its Title VII action challenging the Board's employment practices, the United States adduced significant statistical evidence. Although the litigation was settled before an adjudication as to whether the United States had sustained its burden, these statistics serve to satisfy the requisite

evidentiary showing by the Board in the face of the Brennan intervenors' own Title VII claim challenging the Agreement, except as it relates to the testing claim involving Exam No. 8206.

As the Supreme Court made clear in *Johnson v. Transportation Agency, Santa Clara County*, 480 U.S. 616 (1987), drawing upon its prior decision in *United Steel Workers of America v. Weber*, 443 U.S. 193 (1979), an employer seeking to justify the adoption of an affirmative-action plan in the face of a challenge under Title VII need not point to its own prior discriminatory practices, nor even to evidence of an "'arguable violation' on its part[,]" 480 U.S. at 630; rather, "it need point only to a 'conspicuous imbalance . . . in traditionally segregated job categories," so long as the plan does not "unnecessarily trammel" the interests of those adversely affected by the plan. *Id.* at 630, 638.

*Johnson* equated "conspicuous imbalance" with "manifest imbalance," and held that "in determining whether an imbalance exists that would justify taking sex or race into account, a comparison of the percentage of minorities or women in the employer's work force with the percentage in the area labor market or general population is appropriate in analyzing jobs that require no special expertise," *id.* at 631-32; however, "[w]here a job requires special training . . . the comparison should be with those in the labor force who possess the relevant qualifications." *Id* at 632.

As the majority opinion in *Johnson* explained, "[a] manifest imbalance need not be such that it would support a prima facie case against the employer[,]" since it "d[id] not regard as identical the constraints of Title VII and the Federal Constitution

on voluntarily adopted affirmative action plans." *Id.* In so holding, the Court rejected the view of Justice O'Connor in her concurring opinion that "the proper initial inquiry in evaluating the legality of an affirmative action plan by a public employer under Title VII is no different from that required by the Equal Protection Clause[,]" namely that "the employer must have had a firm basis for believing that remedial action was required," which she equated to proof "sufficient to support a prima facie claim under Title VII." *Id.* at 649 (O'Connor, J., concurring). The majority opinion's rationale for embracing the manifest imbalance standard, rather than requiring the employer to meet the more demanding *prima facie* burden needed to establish a Title VII disparate impact, was that "[a]pplication of the 'prima facie' standard in Title VII cases would be inconsistent with *Weber*'s focus on statistical imbalance, and could inappropriately create a significant disincentive for employers to adopt an affirmative action plan." *Id.* at 632-33.

Thus, the "manifest imbalance" test differs from a *prima facie* case of disparate impact in two important respects: First, as *Johnson* makes clear, the requisite magnitude of the disparity is less under the "manifest imbalance" test, although just how much less is unclear. *See* David E. Meyer, *Note: Finding a "Manifest Imbalance": The Case for A Unified Statistical Test for Voluntary Affirmative Action under Title VII*, 87 Mich. L. Rev. 1986 (June 1989) (noting that apart from observing in *Johnson* that an imbalance need not be severe enough to support a *prima facie* case of discrimination, "[t]he Court

has not gone further . . . in defining a floor beneath which an imbalance will not be considered sufficiently 'manifest.'").[35]

Second, the statistical evidence need not establish a causal connection between the disparity and any challenged employment practice; as explained in *Johnson*, this latter difference "between the 'manifest imbalance' and 'prima facie' standards is illuminated by *Weber*." 480 U.S. at 633 n.10. The affirmative-action plan in *Weber* was implemented to remedy the gross under-representation of blacks among the skilled craftworkers at one of the employer's plants; the disparity existed, not because the employer had refused to hire qualified blacks, but "[b]ecause blacks had long been excluded from craft unions." 443 U.S. at 198. The Supreme Court upheld the plan because it "f[ell] within the area of discretion left by Title VII to the private sector voluntarily to adopt affirmative action plans designed to eliminate conspicuous [i.e., manifest] racial imbalance in traditionally segregated job categories." *Id.* at 209. By contrast, the *prima facie* standard – with its insistence on a causal connection between the disparity and a practice attributable to the employer – "would have invalidated the plan in *Weber* itself." *Johnson*, 480 U.S. at 633 n.10.

---

[35]The articulation of the "manifest imbalance" and "unnecessary trammeling" standard for adjudicating Title VII challenges to affirmative-actions plans contrasts with the standard governing a court's approval of a settlement agreement in the absence of such litigation - namely, whether "there is an existing condition that serves as a proper basis" for the plan, and whether the "specific remedies of the compromise agreement are reasonable and lawful." *Kirkland*, 71 F.2d at 1129. Obviously, neither standard can conflict with Title VII or Constitutional proscriptions, but the manifest imbalance standard, employed when the specific claims of third-party litigants are the subject of litigation, calls for a more focused and heightened assessment of those claims.

**1. Testing Claims**

Except in respect to Exam 8206, affecting the one Hispanic, Luis Torres, the Court need not reflect upon the nuanced differences between a manifest imbalance and a *prima facie* disparate impact since the Board's statistical evidence, adduced by the United States in its litigation against the Board, satisfied the higher *prima facie* standard, which has not been overcome by the Brennan intervenors' challenges.[36]

The Second Circuit has explained that it primarily relies upon two methods to evaluate *prima facie* disparities under Title VII, namely the "four-fifths" (or 80%) rule and the "two standard deviations" rule:

---

[36]As *Johnson* holds, where an employer has taken any prohibited Title VII factor into account for its employment decision,

> the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision. The existence of an affirmative action plan provides such a rationale. If such a plan is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid. As a practical matter, of course, an employer will generally seek to avoid a charge of pretext by presenting evidence in support of its plan. That does not mean, however, as petitioner suggests, that reliance on an affirmative action plan is to be treated as an affirmative defense requiring the employer to carry the burden of proving the validity of the plan. The burden of proving its invalidity remains on the plaintiff.

480 U.S. at 626-27. The unique procedural posture of this case obviates the need for the Court to delve into the application of these shifting burdens; faced with statistical evidence establishing a manifest imbalance, the Brennan intervenors, as the parties challenging the Agreement, had the ultimate burden of proof. *See Bass v. Board of County Comm'rs*, 256 F.3d 1095, 1114 (11th Cir. 2001) (noting that the burden of proof in challenges under Title VII rests with challenger "unless or until the Supreme Court revisits its holding in *Johnson*").

First, we have considered persuasive the EEOC Guideline [29 C.F.R. § 1607.4D] that states that:

> A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact. Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms . . . .

> As an alternative measure of differences between groups, we have also looked to whether the plaintiff can show a statistically significant disparity of *two* standard deviations. . . . Courts generally consider this level of significance sufficient to warrant an inference of discrimination.

> Although courts have considered both the four-fifths rule and standard deviation calculations in deciding whether a disparity is sufficiently substantial to establish a prima facie case of disparate impact, there is no one test that always answers the question. Instead, the substantiality of a disparity is judged on a case-by-case basis.

*Smith v. Xerox Corp.*, 196 F.3d 358, 365 (2d Cir. 1999) (internal citations omitted; emphasis added), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, ___ F.3d ___, 2006 WL 2338174, at *4 (2d Cir. 2006). These rules of thumb go *only* to the magnitude of the disparity; they have no bearing on whether the disparity is attributable to the employer's actions. *See, e.g., EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1277-78 (11th Cir. 2000) (rejecting Title VII challenge despite significant disparity between employer's "female hiring percentage (0%) [and] the percentage of women in the qualified labor market (31.9%)," because EEOC failed "to show a causal link

between some facially-neutral employment practice . . . and the statistical disparity" (emphasis omitted)).

The pass rates for blacks on the three challenged exams ranged between 23.3% and 58.8% of the pass rates for whites; these disparities varied from the expected results by between 5.14 and 13.85 standard deviations. *See* Table, *supra* p. 12. Under both a "four-fifths" analysis and a "two standard deviations" analysis, this statistical evidence is unquestionably sufficient "to serve as a predicate for a voluntary compromise containing race-conscious remedies." *Kirkland*, 711 F.2d at 1130. The results for two of the exams are likewise adequate to justify affirmative action for Hispanic test-takers: Hispanics passed Exam No. 5040 and Exam No. 1074 at roughly 50% the pass rate of whites, a disparity amounting to approximately 8 standard deviations. *See* Table, *supra* p. 12.

In the face of these statistics, the Brennan intervenors concede that there was, as to blacks, a manifest imbalance on all three exams, and, as to Hispanics, a manifest imbalance on Exams No. 5040 and 1074, *see* October 6, 2005 Oral Argument Tr. at 29 ("MR. COLANGELO: Speaking specifically to the testing claims, the United States' testing claims which affect the Arroyo intervenors, there's a concession of the disparate impact in three of the exams as they affected African-Americans, two of them as they affected Hispanic test takers. The Court: That's true, Mr. Rosman, correct? MR. ROSMAN: Yes, it is."); they argue, however, that, as to Hispanics, Exam 8206 did not result in a manifest imbalance.[37]

_____

[37]The Brennan intervenors also contend that the challenged exams were consistent with business necessity. Although in a non-affirmative-action case, *employers*

As recounted in the Background section, the effect of Exam No. 8206 on Hispanics when unqualified test-takers are removed from the equation is in dispute; depending on the methodology employed by the experts to ascertain the number of unqualified test-takers, qualified Hispanics passed the exam at anywhere between 77.7% and 95.2% the rate of whites, resulting in discrepancies of between 0.37 and 2.51 standard deviations. Faced with these inconsistencies, the Court cannot determine as a matter of law that Exam No. 8206 resulted in the requisite manifest imbalance to warrant affirmative-action relief for the one affected Hispanic; accordingly, a hearing is required to resolve this issue.

## 2. Recruiting Claim

The disparities underlying the United States' recruiting claim – that is, the differences between the expected and actual numbers of black, Hispanic, Asian and female test-takers – ranged from 2.76 to 12.81 standard deviations. *See* Tables, *supra* pp. 14-15. Notably, these discrepancies were not calculated simply by comparing the number of minorities and women who took the exams to the number of minorities and women in the general labor pool; rather, Dr. Ashenfelter used previous occupations as a proxy for work experience to derive comparators of *qualified* minorities and women.

Since there were at least two standard deviations between the actual and expected number of qualified test-takers, the evidence was sufficient to establish for each exam a manifest imbalance in the traditionally segregated custodial positions. The

---

may defeat a disparate-impact claim by demonstrating that their challenged practice is consistent with business necessity, *see Robinson*, 267 F.3d at 161, it is ludicrous to argue that when an employer takes action to rectify past discrimination it is acting contrary to its business needs.

Brennan intervenors do not claim otherwise, but challenge the statistics on other grounds, contending that they do "not take into account the qualifications and interest of those in [Dr. Ashenfelter's] comparator group," *see* Brennan Intervenors' Mem. of Points and Authorities in Response to this Court's July 20 Order ("Brennan Intervenors' Mem.") at 57-58, and do not establish a causal relationship. *See id.*[38]

Although the Brennan intervenors' expert sought to undermine Dr. Ashenfelter's report, the Brennan intervenors have not presented any evidence to countermand Dr. Ashenfelter's statistical analysis or his basis for arriving at his comparators. It was not necessary for the Board to "rule out all other variables to prevail," *United States v. City of Warren*, 138 F.3d 1083, 1094 (6th Cir. 1998) (citations omitted); rather, as the party bearing "[t]he burden of proving [the plan's] invalidity," *Johnson*, 480 U.S. at 627, it was incumbent on the Brennan intervenors to present evidence that was "more accurate, valid, or reliable than the [Board's] evidence." *Robinson*, 267 F.3d at 161; *see also EEOC v. Joint Apprenticeship Comm. of Joint Industry Bd. of Elec. Industry*, 164 F.3d 89, 98 (2d Cir. 1998) (noting that statistical evidence of disparate impact could not be debunked by "unsupported conjectures and assertions" that other, non-discriminatory factors would explain the disparities). This they have failed to do.

Nor was it necessary for the Board to establish a causal relationship between the manifest imbalance and its recruiting practices since, once again, as *Johnson*

---

[38]In arguing lack of causation, the Brennan intervenors do not prescind between their Title VII and Fourteenth Amendment challenges. As will be seen, the distinction is a material one.

explained, the employer "need not point to is own prior discriminatory practices." 480 U.S. at 630.

## B. Relief

As for those beneficiaries who were not actual victims of discrimination, the Brennan intervenors' argue (1) that the grant of retroactive seniority to non-victims is never permissible as part of an affirmative-action program; (2) alternatively, that the seniority awards in all respects unnecessarily trammel their rights.[39]

As for the first argument, the Supreme Court in *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561 (1984), left open the issue as to whether an employer can voluntarily adopt an affirmative-action plan awarding retroactive seniority to non-victims of discrimination – specifically, preferential layoff protection – without violating Title VII. *See id.* at 583 ("Whether the City . . . could have taken this course without violating the law is an issue we need not decide.").[40] The Brennan intervenors correctly note that the Supreme Court has yet to address the issue, and rely on two Second

_____

[39]The Brennan intervenors do not question that retroactive seniority is appropriate for those beneficiaries who were actual victims of discrimination, nor could they in light of the clearly established Supreme Court and Second Circuit cases holding that retroactive seniority can be awarded, be it by court order after trial, consent decree, or by an affirmative-action plan to actual victims of discrimination in order to afford them make-whole relief. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977); *Franks v. Bowman Transp. Co.*, 424 U.S. 747 (1976); *Chance v. Board of Examiners,* 534 F.2d 993 (2d Cir. 1976); *Acha v. Beame,* 531 F.2d 648 (2d Cir. 1976). The rationale for doing so is that the non-minorities are not being victimized; rather, the victims of discrimination are being put in their rightful place.

[40]Although the city was a public employer, the Fourteenth Amendment was not at issue since the plan was challenged only on the ground that it was not a proper remedy under Title VII. *See Stotts*, 467 U.S. at 582-83.

Circuit cases to support their contention, *Chance v. Board of Examiners,* 534 F.2d 993 (2d Cir. 1976), and *Acha v. Beame,* 531 F.2d 648 (2d Cir. 1976). Their reliance is misplaced.

In *Chance,* the circuit court simply struck down racial seniority preferences because there was no showing under § 703(h) of Title VII, in the face of a bona fide seniority system, of an actual intent to discriminate against minorities. *See* 534 F.2d at 998 ("[T]he non-remedial distortion of a seniority system through preferential treatment based solely upon race is a form of reverse discrimination specifically proscribed by Congress.").[41] *Acha* involved a situation where there *was* adequate proof of racial discrimination; accordingly, the court held that the "[a]ward of seniority to those who had actually been discriminated against by the[] defendants is not a 'preference' because of sex. It is rather a remedial device well within the broad power conferred on the district court by section 706(g)." *Acha*, 531 F.2d at 656 (citing 42 U.S.C. § 2000e-5(g)).[42]

_____

[41]Section 703(h) provides:

> [I]t shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(h).

[42]Section 706(g) provides that, upon a finding of unlawful discrimination, a court may enjoin the challenged employment practice and "order such affirmative relief as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate[,]" but that

*Chance* and *Acha,* therefore, simply addressed situations where the circuit court had to determine whether the requisite discrimination under § 703(h) had been established to justify a district court's award of retroactive seniority to actual victims of discrimination. Nothing in those cases addressed the issue of whether a voluntary affirmative-action plan granting retroactive seniority to non-victims of discrimination would violate Title VII. In a similar vein, the Brennan intervenors' reliance upon *Franks v. Bowman Transportation Company*, 424 U.S. 747 (1976), and *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), is also miscast since, like *Acha*, they simply held that § 703(h) did not preclude a court from awarding retroactive seniority to actual victims of discrimination.

*Stott*'s open question notwithstanding, there is nothing in Title VII that vitiates an affirmative-action plan granting preferential seniority to non-victims of discrimination; to hold otherwise would be anathema to the broad reach of *Weber* and *Johnson,* and the Supreme Court's explicit holding, subsequent to *Stotts*, in *Local No. 93, Int'l Assoc. of Firefighters v. City of Cleveland*, that "whatever the extent of the limits § 706(g) places on the power of the federal courts to compel employers and unions to take certain actions that the employers or unions oppose[,]" it "by itself does not restrict

> [n]o order of the court shall require the admission or
> reinstatement of an individual as an employee, or the hiring,
> reinstatement or promotion of an individual as an employee,
> or the payment to him of any back pay, if such individual
> was refused admission, suspended, or expelled, or was
> refused employment or advancement or was suspended or
> discharged for any reason other than discrimination on
> account of race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-5(g).

the ability of employers or unions to enter into voluntary agreements providing for race-conscious remedial action."  478 U.S. 501, 521 (1986);[43] *see also Paradise v. Prescott*, 767 F.2d 1514, 1529 (11th Cir. 1985) ("[N]either Section 706(g) nor the *Stotts* case, prevents a court from approving a consent decree that provides relief which is consistent with, but goes beyond, that authorized in the underlying statute." (citation omitted)).

Resolution of the validity of the retroactive seniority benefits in the present case for non-victims of discrimination should be governed, therefore, by the guidance provided by *Weber* and *Johnson* in determining whether the relief afforded by the Agreement unnecessarily trammeled upon the rights of the non-minorities.  This requires discrete consideration of the impact the preferential seniority accorded to those beneficiaries had on the Brennan intervenors' transfer rights, TCA credits and protection against layoffs.

In *Weber*, white workers brought a Title VII action against their private employer challenging the legality of an affirmative-action plan entered into between the employer and the employees' union under a collective bargaining agreement that reserved for black employees 50 percent of the openings in an in-plant craft training program until the percentage of black craftworkers at the plant was commensurate with the percentage of blacks in the local labor force.  After noting that "Title VII's

---

[43]The affirmative-action plan incorporated in the consent decree in *Local No. 93* involved the alteration of a seniority system (requiring the City to forego using seniority points as a factor in making promotions).  The Supreme Court did not reach the merits of the plan, holding only that the restrictions of § 706(g) are inapplicable to consent decrees.

prohibition in §§ 703(a) and (d) against racial discrimination does not condemn all private, voluntary, race-conscious affirmative action plans," 443 U.S. at 208,[44] the Court gave its approval to the plan without "defin[ing] in detail the line of demarcation between permissible and impermissible affirmative action plans." *Id.* It reasoned:

> It suffices to hold that the challenged . . . affirmative action plan falls on the permissible side of the line. The purposes of the plan mirror those of the statute. Both were designed to break down old patterns of racial segregation and hierarchy. Both were structured to 'open employment opportunities for Negroes in occupations which have been traditionally closed to them.' At the same time, the plan does not unnecessarily trammel the interests of the white employees. The plan does not require discharge of white workers and their replacement with new black hirees. (citation omitted). Nor does the plan create an absolute bar to the advancement of white employees; half of those trained in the program will be white. Moreover, the plan is a temporary measure; it is not intended to maintain racial balance, but simply to eliminate

---

[44]Section 703(a) of Title VII makes it unlawful for an employer (1) "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[,]" or (2) "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a). As explained in *Griggs*, the latter proscription serves as the basis for disparate-impact claims. *See* 401 U.S. at 431. Section 703(d) provides:

> It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

42 U.S.C. § 2000e-2(d).

a manifest racial imbalance. Preferential selection of craft trainees at the Gramercy plant will end as soon as the percentage of black skilled craftworkers in the Gramercy plant approximate the percentage of blacks in the local labor force.

*Id.* at 208-09.

In *Johnson,* the Court had the opportunity to consider the validity of an affirmative-action plan voluntarily adopted by a public agency in the face of a Title VII challenge by a male who was denied promotion in favor of a female where sex was the determining factor in her selection.[45]  After finding that there was the requisite manifest imbalance, based on a showing that none of the 238 skilled craftworker positions in the Santa Clara County labor force were held by women, the Court, addressing the second branch of *Weber*, held that the plan did not "unnecessarily trammel[ ] the rights of male employees or create[] an absolute bar to their advancement" since it "merely authorize[d] that consideration be given to affirmative action concerns when evaluating qualified applicants," and that sex was simply "one of numerous factors" that were taken into account.  480 U.S. at 638.  Amongst the other factors were that (1) the plan did not involve quotas; (2) the non-minority had no absolute entitlement to the position and, consequently, the plan did not unsettle any legitimate, firmly rooted expectation; (3) although denied the promotion, the non-minority retained his employment at the same salary and seniority, and remained eligible for future promotions; and (4) the plan was intended to attain a balanced workforce, not maintain one.  In concluding, the

_____

[45]Although the employer in *Johnson* was a state actor, the employee only sued under Title VII; "no constitutional issue was either raised or addressed in the litigation." 480 U.S. at 620.

Court viewed the plan as "a moderate, flexible, case-by-case approach to effecting a gradual improvement in the representation of minorities and women in the Agency's work force." *Id.* at 642. As such, it was "fully consistent with Title VII, for it embodie[d] the contribution that voluntary employer action can make in eliminating the vestiges of discrimination in the workplace." *Id.*

### 1. Transfers and TCAs

Under *Weber* and *Johnson* the award of retroactive seniority to non-victims insofar as it affects transfers and TCAs passes muster under Title VII. In the first place, it has a limited effect: While being passed over for a transfer or a TCA is not inconsequential, it is less harsh than losing one's job or being required to accept a reduction in pay; in any event, there is no absolute entitlement by any employee to either of these benefits.

Moreover, neither race, national origin nor gender are "absolute bars" to advancement by the non-minorities; there are no quotas or set-asides for minorities and women on the transfer and TCA lists. With respect to transfers, seniority is only one factor; with respect to TCAs, seniority only affects the order in which TCAs are awarded, not their frequency. And even when race, national origin or gender proves to be the deciding factor, the unsuccessful applicant remains eligible for future transfers and TCAs. Finally, the award is temporary – it comprises a one-time benefit to current employees; future hires will attain and accrue seniority without regard to race, national origin or gender.

The Court's conclusion is consistent with out-of-circuit cases receptive to affirmative-action plans granting preferential promotions in the face of Title VII challenges by non-minorities whose seniority rights were compromised by preferences bestowed upon minority non-victims.  *See, e.g., Vanguards of Cleveland v. City of Cleveland*, 753 F.2d 479, 487 (6th Cir. 1985) (upholding affirmative-action plan that provided that remedial promotions would be made on basis of one non-minority to one minority appointee "even though the plan [had] the effect of overriding the seniority rights of non-minorities"); *Kromnick v. School Dist. of Philadelphia,* 739 F.2d 894, 911 (3d Cir. 1984) (providing minorities certain preferences in transfers in order to maintain a target ratio of minority faculty to students); *Prescott*, 767 F.2d at 1514 (approving one-for-one promotional order entered by court in support of a voluntary consent decree).

## 2. Layoffs

In *Wygant v. Jackson Board of Education*, 476 U.S. 267 (1986), the Supreme Court struck down under the Fourteenth Amendment an affirmative-action plan affording preferential layoffs to non-victims of discrimination.  The plurality opinion, citing *Stotts* and *Weber,* noted that it had "previously expressed concern over the burden that a preferential-layoffs scheme imposes on innocent parties," *id.* at 282, and explained:

> In cases involving valid hiring goals, the burden to be borne by innocent individuals is diffused to a considerable extent among society generally. Though hiring goals may burden some innocent individuals, they simply do not impose the same kind of injury that layoffs impose. Denial of a future employment opportunity is not as intrusive as loss of an existing job.

*Id.* at 283-84.

Although, as the Court subsequently explains in addressing the Brennan intervenors' constitutional challenges, the Board's grant of seniority benefits as to layoffs would not survive the Fourteenth Amendment's standards for race- and national-origin-based remedies, it also fails Title VII's unnecessary-trammeling test, which applies with equal force to affirmative-action plans based on race, national origin *and* gender.

Five circuit courts have passed upon the propriety of affirmative-action plans granting layoff preferences to non-victims in the face of Title VII challenges. Three have approved, *see Tangren v. Wackenhut Servs., Inc.,* 658 F.2d 705 (9th Cir. 1981); *Britton v. South Bend Community School Corp.,* 775 F.2d 794 (7th Cir. 1985), *rev'd on other grounds,* 819 F.2d 766 (7th Cir. 1987); *Wygant v. Jackson Board of Educ.,* 746 F.2d 1152, 1157-58 (6th Cir. 1984), *rev'd on other grounds,* 476 U.S. 267 (1986); however, they preceded *Johnson,* where the Supreme Court gave content to the unnecessarily-trammeling prong.

More significantly, the alteration of seniority rights impacting layoffs in each of those cases was sanctioned by a collective bargaining agreement ("CBA"). *See Tangren,* 658 F.2d at 707; *Britton,* 775 F.2d at 805; *Wygant,* 746 F.2d at 1157. A CBA is the culmination of negotiations between an employer and a union charged with representing the interest of *all* its members, minority and non-minority alike; as the Ninth Circuit noted in *Tangren,* "[s]eniority is merely an economic right which the unions may elect to bargain away." 658 F.2d at 707. It would be disingenuous for an

employee to argue that an employer's affirmative-action plan had disrupted settled expectations when those expectations had been created by a CBA incorporating the plan.

By contrast, the two cases where the circuit courts disapproved did not entail collective bargaining agreements; moreover, they were decided after *Johnson*. In *Cunico v. Pueblo School Dist. No. 60*, 917 F.2d 431 (10th Cir. 1990), when a school district needed to lay off all but two of its social workers, the district opted to retain a black social worker because a school policy provided "[i]n the event of a reduction in force, the District shall make reasonable effort to maintain, as a minimum, the percentage of minority teachers employed within the district." The Tenth Circuit held that the plan unnecessarily trammeled the rights of non-minorities because each of the factors present in *Johnson* was absent, explaining:

> In contrast to the plan in *Johnson*, the position given to [the minority employee] was earmarked for a black person to the exclusion of all other qualified persons. Second, the trial court found that plaintiff was entitled to the position given to [the minority employee] by virtue of her seniority. Third, the District's decision, which by its own terms was made to ensure employment of at least one black administrator, was intended to maintain rather than achieve a particular racial balance.

*Id.* at 440 (internal citations omitted).

The Third Circuit was faced with a similar situation in *Taxman v. Board of Educ. of Twp. of Piscataway*, 91 F.3d 1547 (3d Cir. 1996). There, a school district used race as a factor in selecting which of two equally qualified employees would be laid off. After holding that the layoff plan was not supported by a manifest imbalance in the

employment of minorities, the court also held that the plan failed the "unnecessary trammeling" standard, explaining:

> [W]e are convinced that the harm imposed upon a nonminority employee by the loss of his or her job is so substantial and the cost so severe that the Board's goal of racial diversity, even if legitimate under Title VII, may not be pursued in this particular fashion. This is especially true where, as here, the nonminority employee is tenured. In *Weber* and *Johnson*, when considering whether nonminorities were unduly encumbered by affirmative action, the Court found it significant that they retained their employment. We, therefore, adopt the plurality's pronouncement in *Wygant* that [w]hile hiring goals impose a diffuse burden, often foreclosing only one of several opportunities, layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives. That burden is too intrusive. Accordingly, we conclude that under the second prong of the *Weber* test, the Board's affirmative action policy violates Title VII. In addition to containing an impermissible purpose, the policy unnecessarily trammel[s] the interests of the [nonminority] employees.

*Id.* at 1564-65 (citations and quotations omitted).

In the same vein as the Tenth Circuit in *Cunico* and the Third Circuit in *Taxman*, the Court concludes that, insofar as they affect layoffs, the seniority benefits provided by the Agreement unnecessarily trammel upon the rights of the Brennan intervenors because they impose too heavy a burden. And, unlike transfers and TCAs, which are subject to additional considerations unrelated to race, national origin or gender, such as job performance and availability, layoffs will be based solely on seniority.

The Agreement's effect on layoffs is materially different from the affirmative-action promotion approved in *Johnson*. First, layoffs entail loss of one's job,

salary and eligibility for future advancement. *Cf. Johnson*, 480 U.S. at 638 ("[W]hile petitioner . . . was denied a promotion, he retained his employment . . ., at the same salary and with the same seniority, and remained eligible for other promotions."). Second, while permanent employees have no entitlement to any particular transfer or TCA, they do, under New York law, have a legitimate expectation that layoffs will be based on seniority; altering this system to account for race, national origin or gender disrupts that expectation. *Cf. id.* ("[D]enial of the promotion unsettled no legitimate, firmly rooted expectation on the part of petitioner."). Finally, layoffs would have the effect of *maintaining*, rather than *attaining*, a balanced workforce. *Cf. id.* at 618 ("There is ample assurance that the Agency does not seek to use its Plan to 'maintain' a permanent racial and sexual balance.").

As noted, there were seven actual victims of the exams, and they are entitled to the layoff protection afforded by the award of permanent-employee status and retroactive seniority. However, there are not uncontroverted facts before the Court to determine if there are others; accordingly, a hearing is required. *See, e.g.*, October 6, 2005 Oral Argument Tr. at 32 ("MS. MARTIN: I don't believe there needs to be any showing that each of the beneficiaries were individual victims of discrimination in order for these awards to be approved. However, if your Honor were to disagree with that legal conclusion, we would seek a hearing so that we can put forward evidence of clients' individual victim claims."); *id.* at 18 ("MS. COTE: If the court rules retroactive seniority can only be given to identifiable victims, then you may have to have an

evidentiary hearing on whether particular individual beneficiaries were also victims.").[46]

### Fourteenth Amendment

The Court's analysis does not end at Title VII because it still must determine whether the grant of retroactive seniority, which passes muster under Title VII in all respects for all the beneficiaries within the protected class, other than in respect to preferential seniority accorded to non-victims for layoffs, violates the Fourteenth Amendment. "Although the obligations of a public employer under Title VII are similar to its obligations under the Federal Constitution, they are not the same," *Edwards v. City of Houston*, 37 F.3d 1097, 1110 (5th Cir. 1994); therefore, "where the issue is properly raised, public employers must justify the adoption and implementation of a voluntary affirmative action plan under the Equal Protection Clause." *Johnson*, 480 U.S. at 620 n.2. Since, unlike Title VII, the Fourteenth Amendment requires the application of different standards for race and gender classifications, they must separately be considered.[47]

---

[46]The Court will not resolve at this time which party bears the burden of proving which beneficiaries were or were not actual victims of discrimination, and will invite the parties to address that issue prior to the hearing.

[47]For purposes of the Fourteenth Amendment , as under Title VII, "[i]t is undisputed . . . that principles of analysis applicable to race-based affirmative action programs are the same as those applicable to national-origin-based affirmative action programs." *Jana-Rock Const., Inc. v. New York State Dep't of Econ. Development*, 438 F.3d 195, 200 n.1 (2d Cir. 2006). Thus, the Court's analysis of the Board's race-based relief applies equally to relief based on national origin.

**A. Race-Based Classifications**

As *Wygant* makes clear, affirmative-action plans by state actors based on racial considerations are subject to strict-scrutiny analysis under the Fourteenth Amendment, requiring the state actor to establish (1) that there was a compelling interest for adopting the plan, and (2) that the plan was narrowly tailored to meet that interest. *See Wygant,* 476 U.S. 267 at 274. Nonetheless, "there may be instances in which a public employer, consistent with both the Fourteenth Amendment as interpreted in *Wygant* and § 703 as interpreted in *Weber,* could voluntarily agree to take race-conscious measures in pursuance of a legitimate remedial purpose." *Local No. 93,* 478 U.S. at 518 n.8.

**1. Compelling Interest For Race-Based Relief**

In *Barhold v. Rodriguez,* 863 F.2d 233 (2d Cir. 1988), the Second Circuit embraced the concurring opinion of Justice O'Connor in *Wygant* as to the showing that a public employer must make, in the face of a Fourteenth Amendment challenge, to support its compelling reason for approving an affirmative-action plan: "[I]t must have a *firm* basis for believing that remedial action is required." *Id.* at 236 (citation omitted and emphasis added). Subsequently, in *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469 (1989), the Supreme Court adopted the plurality opinion in *Wygant* that there must be a "*strong* basis in evidence for its conclusion that remedial action was necessary[,]" and equated that to evidence "approaching a prima facie case of a constitutional or statutory violation . . . ." *Id.* at 500 (emphasis added); *accord Boston Police Superior Officers Fed'n v. City of Boston,* 147 F.3d 13, 20 (1st Cir. 1998) ("The 'strong basis' may consist of either a

contemporaneous or antecedent finding of past discrimination by a court or other competent body, or evidence approaching a prima facie case of a constitutional or statutory violation." (citations and internal quotation marks omitted)).[48]

*Wygant* and *Croson* represent a more fundamental divide than the nuanced differences between the evidentiary standards for assessing disparities under Title VII and the Fourteenth Amendment in the context of affirmative-action plans. Whereas causation is not implicated under Title VII since the employer need not point to its own past discrimination, *see Johnson*, 480 U.S. at 630, it is the touchstone of constitutional analysis because "the Equal Protection Clause require[s] 'some showing of prior discrimination *by the governmental unit involved*.'" *Croson*, 488 U.S. at 492 (quoting *Wygant*, 476 U.S. at 274 (plurality opinion)) (emphasis added). Thus, in *Croson*, although there was a strong basis in evidence establishing gross racial disparities in the municipality's awards of construction contracts, there was no showing of prior governmental discrimination.

In the present case, the government itself created the tests that were proven, by the requisite strong basis in evidence, to be discriminatory; thus, the Board's efforts to remedy its own discrimination passes muster under Constitutional analysis. This is not the case, however, in regard to the recruiting claim. There is no question that the statistical disparities established that a disproportionate number of whites took the

---

[48]There is obviously little, if any, conceptual difference between "firm basis" and "strong basis," and, in light of *Croson,* the Second Circuit now employs the "strong basis" language. *See Jana-Rock Constr.*, 438 F.3d at 213 ("We express no view as to whether [] anecdotal accounts, standing alone, could satisfy *Croson*'s demands for a 'strong basis in evidence' that would justify the inclusion of a particular class in an affirmative action program.").

exams, but there is absolutely no evidence that these disparities were occasioned by the Board's own discrimination. Apart from concluding that the disparities were not the result of chance, Dr. Ashenfelter offered no opinion as to their cause. Moreover, the only evidence regarding the Board's recruiting practices reflects an extensive effort by the Board to widely publicize the exams to a variety of diverse sources; the case might be different if there were an evidentiary showing that notification of the exams was calculated to be given to whites. In sum, even though there is a firm basis for concluding that there was a significant disparity between white test-takers and minority test-takers, this alone does not translate to a showing that this disparity resulted from the Board's recruiting practices. To hold otherwise would be to engage in "sheer speculation" and credit "an amorphous claim that there has been past discrimination." *Croson*, 488 U.S. at 499.

According to the United States' relief chart, seven blacks, four Hispanics and one Asian were awarded benefits based on the recruiting claim. If so, these benefits cannot survive strict scrutiny.

In respect to the award of retroactive seniority under the testing claims to the 27 blacks and Hispanics within the protected class for purposes of school transfers and TCAs – which withstands strict scrutiny (other than in respect to Exam 8206) – the Brennan intervenors question whether a compelling interest can ever be satisfied by proof of adverse impact; they argue that state actors may take race and national origin into account only to remedy discrimination arising from *intentional* disparate treatment.

The plan at issue in *Barhold* was designed to remedy such intentional discrimination. *See* 863 F.2d at 237 ("These [alleged discriminatory] practices included the placing of Black officers in predominantly Black, high crime offices and the limiting of women officers' caseloads to women parolees."). The Second Circuit remanded because "the statistics presented [were] insufficient to provide a firm basis for believing that the [employer had] engaged in [such] discriminatory practices," *id.*; the court was not called upon to decide whether a facially race-neutral practice that had a disparate impact could justify a race-conscious remedy.

In other cases, however, the Second Circuit and other circuit courts have assumed that an affirmative-action plan designed to rectify discrimination that springs from proof of a disparate impact passes constitutional muster. *See, e.g., Paganucci v. City of New York*, 785 F. Supp. 467, 477 (S.D.N.Y. 1992) (holding that "the adverse impact" of an examination on minority candidates for promotion justified settlement agreement's race-conscious remedy), *aff'd*, 993 F.2d 310, 312 (2d Cir. 1993) (affirming "for substantially the reasons set forth" in district court's opinion); *Edwards,* 37 F.3d at 1118 ("Clearly, the district court had ample evidence from which to conclude that the plaintiffs have proven disparate impact and that the City of Houston had justifiably concluded that it would be difficult to defend the job relatedness of the questions on the promotional exams."), *rev'd on other grounds*, 78 F.3d 983 (5th Cir. 1996) (en banc); *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1566 (11th Cir. 1994) (holding that the state-actor defendants had a "'strong basis in evidence' for concluding that race-based relief was needed to correct discrimination in the police and fire departments" because the hiring

practices had an "adverse impact" on minorities); *Stuart v. Roache*, 951 F.2d 446, 449-52 (1st Cir. 1991) (holding that statistical evidence demonstrating a "disparate impact" constituted a "'strong' or 'firm' basis in evidence of prior discrimination").

The Brennan intervenors challenge this assumption, relying on the holding of *Washington v. Davis*, 426 U.S. 229 (1975), and Judge Easterbrook's *dicta* in *Biondo v. City of Chicago*, 382 F.3d 680 (7th Cir. 2004).

In *Washington*, the Supreme Court made clear that a disparate impact for purposes of Title VII liability does not equate to a constitutional violation under the Fourteenth Amendment. *See* 426 U.S. at 239 ("We have never held that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII, and we decline to do so today.") *Washington*, however, did not consider whether an admittedly compelling interest to rectify the vestiges of past discrimination by public employers could be established by proof of adverse impact, as opposed to proof of intentional discrimination.

In *Biondo*, however, Judge Easterbrook, noting that "compliance with federal laws cannot automatically be a compelling interest," 382 F.3d at 684, questioned whether, in light of *Washington*, remedying an adverse impact could ever serve a compelling governmental interest. *Biondo* involved the Chicago Fire Department's policy of awarding promotions in rank-order sequence based on an applicant's performance on a written examination. After the city concluded (1) that, under the EEOC's "four-fifths" regulation, *see* 27 C.F.R. § 1607.4(D), discussed *supra*, the exam had a disparate impact on minorities, and (2) that there was no legitimate business

justification for awarding promotions in rank-order sequence, it created separate lists for minority and non-minority applicants, and awarded positions proportionally from the two lists. Thereafter, non-minority applicants claimed that this affirmative-action plan violated the Fourteenth Amendment because it was designed to remedy only a disparate impact. In response, the city did not argue that 29 C.F.R. § 1607.4(D) carried out a compelling interest; rather, it argued that it had a compelling interest in *complying* with the regulation.[49]

The Seventh Circuit upheld a jury finding that there was an insufficient factual basis for implementing the affirmative-action plan, thereby obviating the need to address the broader disparate-impact issue. In *dicta*, however, Judge Easterbrook observed:

> [G]iven the holding of *Washington v. Davis* . . . that disparate impact in hiring or promotion by a public employer does not violate the equal protection clause, it is hard to see how . . . an argument that [29 C.F.R. 1607.4 carries out any compelling governmental interest] could be constructed. If avoiding disparate impact were a compelling governmental interest, then racial quotas in public employment would be the norm, and as a practical matter *Washington v. Davis* would be undone.

*Id.*

Judge Easterbrook's concern, therefore, assumed that remedying discrimination is a sufficiently compelling interest only if the discrimination amounts to

---

[49]The city also "did not argue that either past discrimination or a quest for diversity" served as a compelling interest to "support its approach." *Biondo*, 382 F.3d at 683.

a violation of the Fourteenth Amendment's prohibition on *intentional* discrimination. In the Court's opinion, this assumption is unfounded.

As discussed, the Supreme Court has described a governmental unit's interest in remedying past discrimination as sufficiently compelling to warrant race-based affirmative action only when the governmental unit is responsible for the discrimination. *See Wygant*, 476 U.S. at 278 (plurality opinion) ("[A]ny statistical disparities were the result of general societal discrimination, not of prior discrimination by the Board."); *id.* at 288 (O'Connor, J., concurring) ("I agree with the plurality that a governmental agency's interest in remedying 'societal' discrimination, that is, discrimination not traceable to its own actions, cannot be deemed sufficiently compelling to pass constitutional muster under strict scrutiny."). The Court's analysis in *Wygant* did not distinguish between governmental discrimination due to disparate treatment and governmental discrimination due to facially neutral practices that have a disparate impact. Indeed, there is a powerful conceptual reason *not* to make such a distinction. A public employer whose hiring practices impose a disparate impact in violation of Title VII is no less liable simply because the violation was not of constitutional magnitude; its interest in remedying the violation is exactly the same. The Supreme Court recognized as much in *Croson* when, in passing, it described the "strong basis in evidence" standard as evidence "approaching a prima facie case of a constitutional *or statutory* violation." 488 U.S. at 500 (emphasis added).

To forbid public employers from voluntarily complying with their obligations under Title VII is effectively to require them to challenge those obligations

as inconsistent with their duties under the Fourteenth Amendment; such a result is fundamentally inconsistent with the goal of encouraging voluntary compliance and would, as Justice O'Connor noted in another context, "produce the anomalous result that what private employers may voluntarily do to correct apparent violations of Title VII, public employers are constitutionally forbidden to do to correct their statutory and constitutional transgressions." *Wygant*, 476 U.S. at 291 (O'Connor, J., concurring) (citation omitted).

## 2. Narrowly Tailored

Since there was an adequate evidentiary basis for the Board to conclude that the exams had a disparate impact on blacks and, except with respect to Exam No. 8206, on Hispanics as well; and since, in the Court's view, remedying a disparate-impact Title VII violation occasioned by a state actor's own discriminatory conduct is a compelling interest to warrant a race-conscious remedy, the ultimate issue is whether the award of retroactive seniority for purposes of school transfers and TCAs to non-victim blacks and non-victim Hispanics on the testing claims was narrowly tailored. Although the Court has held that the grant of retroactive seniority to such beneficiaries for the purpose of layoffs violates Title VII because it unnecessarily trammels the rights of non-minorities, it will also address the issue under Fourteenth Amendment analysis to obviate the need for remand should the circuit court disagree. *Cf., e.g.*, *Barhold*, 863 F.2d at 238 (limiting scope of remand to the compelling-interest prong of strict scrutiny by affirming district court's determination that affirmative-action plan was narrowly tailored).

Although the circuit court in *Barhold* remanded due to insufficient evidence that the affirmative-action plan at issue served a compelling interest, it agreed with the district court that the plan was narrowly tailored; in reaching that conclusion, it applied the criteria set forth in *United States v. Paradise*, 480 U.S. 149 (1987). Under *Paradise*, "to determine if a plan is narrowly tailored, [a court] must look to 'the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties.'" *Barhold*, 863 F.2d at 238 (quoting *Paradise*, 480 U.S. at 171).

Application of the *Paradise* factors to non-victims of discrimination does not alter the results arrived at under the Title VII standard.[50]

## a. Transfers and TCAs

In *Barhold,* the Second Circuit analyzed whether an affirmative-action plan designed by the New York Division of Parole to remedy a perceived imbalance in the number of females and minorities in parole officer positions outside of New York City was narrowly tailored. *See* 863 F.2d 233. Prior to the implementation of the plan, the Division awarded transfers based on seniority, which favored males and non-minorities. Under the plan, the Division awarded half of its transfers based on a

_____

[50]No one disputes that, as in Title VII, relief that makes whole *actual* victims of discrimination is warranted. *See Croson,* 488 U.S. at 526 (Scalia, J., concurring) ("[O]f course, a State may undo the effects of past discrimination in the sense of giving the identified victim of state discrimination that which it wrongfully denied him – for example, giving to a previously rejected black applicant the job that, by reason of discrimination, had been awarded to a white applicant, even if this means terminating the latter's employment. That is worlds apart form the system here, in which those to be disadvantaged are identified solely by race.").

combination of seniority, race and gender, and the remaining half based solely on seniority.  The circuit court held that it was narrowly tailored:

> The Division has attempted to integrate its workforce through hiring and minority recruitment efforts, but this has not increased the numbers of women and minorities in offices outside New York City.  The plan itself is designed as a temporary measure; in fact, the Division modified it after only four months because of its effectiveness.  The plan as modified is flexible, with affirmative action being only one of several factors that may be taken into consideration in allowing reassignments.  Furthermore, affirmative action can be considered in only half of all reassignments: fully one-half of the reassignments must be made on the basis of seniority.

> The plan does not set quotas for each region, but only goals used as a "benchmark" for assessing progress.  Because the Division draws its employees from a statewide pool, it was proper for it to use statewide statistics to assess its needs.  Finally, the impact on third parties has not been excessive and the interests of White males have not been unnecessarily trammeled.  The plan was implemented as twenty-nine new positions were created; hence, there was still a considerable number of reassignment possibilities for White males.  In fact, under the first year of the plan and its modification, over seventy percent of the reassignments were of White males.

> Considering these factors and the plan's lack of effect in job opportunities such as hiring, layoffs or promotions, the district court's conclusion that the plan is sufficiently narrowly tailored to meet the compelling state interest will not be upset.

*Id.* at 238 (internal citations omitted).

As *Barhold* demonstrates, the factors used to determine whether an affirmative-action plan is narrowly tailored under the Fourteenth Amendment are closely related to those used to determine whether the plan unnecessarily trammels the rights of third parties under Title VII.  Indeed, the two tests are cut from the same

conceptual cloth in that they both require consideration of a plan's effect on innocent third parties. *See, e.g., Paradise*, 480 U.S. at 171 (listing "the impact of the relief on the rights of third parties" as one factor to be considered under "narrowly tailored" prong of strict scrutiny).

The award of retroactive seniority to remedy the adverse impact of the exams is, for the purposes of transfers and TCAs, carefully circumscribed in its scope and effect, making a one-time adjustment for those entitled to such relief under the testing claims without establishing quotas or creating an absolute bar to the non-minorities' abilities to obtain those perquisites. Just as that feature contributed to the Court's conclusion that the award did not, for purposes of transfers and TCAs, unnecessarily trammel the rights of third parties, it compels the conclusion that the award is narrowly tailored.

**b. Layoffs**

In *Wygant*, the Supreme Court invalidated a CBA provision between a board of education and a teachers' union; the CBA provided that "if it became necessary to lay off teachers, those with the most seniority would be retained, except that at no time would there be a greater percentage of minority personnel laid off than the current percentage of minority personnel employed at the time of the layoff." 476 U.S. at 267. Three justices concluded that "the Board's selection of layoffs as the means to accomplish even a valid purpose cannot satisfy the demands of the Equal Protection Clause." *Wygant*, 476 U.S. at 284. A fourth justice, Justice White, concurring in the judgment, more bluntly stated that layoffs on the basis of race could never be tolerated

unless necessary to protect a victim of prior discrimination.  *See id.* at 295 (White, J.,

concurring) ("Whatever the legitimacy of hiring goals or quotas may be, the discharge

of white teachers to make room for blacks, none of whom has been shown to be a victim

of any racial discrimination, is quite a different matter.  I cannot believe that in order to

integrate a work force, it would be permissible to discharge whites and hire blacks until

the latter comprised a suitable percentage of the work force.  None of our cases suggest

that this would be permissible under the Equal Protection Clause.").  The fifth justice

comprising the majority, Justice O'Connor, concurred on the narrowest grounds,

concluding that "[b]ecause the layoff provision . . . acts to maintain levels of minority

hiring that have no relation to remedying employment discrimination, it cannot be

adjudged 'narrowly tailored' to effectuate its asserted remedial purpose."  *Id.* at 294

(O'Connor, J., concurring).  However, she declined "to resolve the troubling questions

whether any layoff provision could survive strict scrutiny or whether this particular

layoff provision could, when considered without reference to the hiring goal it was

intended to further, pass the onerous 'narrowly tailored' requirement."  *Id.* at 293-94

(O'Connor, J., concurring).  As a result of Justice O'Connor's reservation on the question

of whether individuals may *ever* be subject to layoffs on account of their race, *Wygant*

lacked a majority for the proposition that a state actor may never use race as a factor in

determining layoffs unless necessary to protect victims of discrimination.

In *Crumpton v. Bridgeport Education Association*, 993 F.2d 1023 (2d Cir.

1993), the Second Circuit reviewed under the Fourteenth Amendment the propriety of a

consent decree that settled a school-desegregation lawsuit by providing that layoffs

would be administered with an absolute preference to the retention of minority teachers. *See id.* at 1025. The circuit court pointed out that parties "may have more latitude in remedying violations of the Constitution than in remedying violations of Title VII," *id.* at 1030; nonetheless, the court found that the layoff provision was not narrowly tailored, noting that it "[went] far beyond the proportional plan invalidated in *Wygant*." *Id.* at 1031. It explained:

> In this case, white teachers may have expected the layoffs to be proportional given their collective bargaining agreement, which speaks in terms of preserving the gains made. Consequently, if a proportional layoff scheme had been implemented here, it could have passed muster under *Wygant*. Indeed a proportional layoff scheme may be necessary in order to safeguard the progress made in Bridgeport toward desegregation. No court, however, has held that a layoff procedure giving absolute preference to minorities is narrowly tailored to achieve the goal of rectifying past injustices of any form.

*Id.* (internal citations omitted).

Again, the reasons courts reject race-conscious layoffs as not narrowly tailored under the Fourteenth Amendment are closely related to the reasons they reject them under Title VII: such remedies impose a heavy burden on innocent third parties and, more than other potential remedies, upset their settled expectations. *See Taxman,* 91 F.3d at 1564-65 (citing *Wygant* for the proposition that the "burden [of layoffs] is too intrusive" to be a proper remedy under Title VII). Those concerns are, as the Court noted in its Title VII analysis, certainly present here. And since there is no suggestion that the Board's challenged employment practices violated the Constitution, *Crumpton's* suggestion that an employer may have "more latitude" in remedying such violations

does not apply. Thus, the Agreement's grant of seniority for purposes of layoffs is not narrowly tailored.

## B. Sex-Based Classifications

Prior to *Croson*, it was clear that gender-based affirmative-action plans were subject to intermediate scrutiny, which required that such plans "serve important governmental objectives and . . . be substantially related to achievement of those objectives." *Califano v. Webster*, 430 U.S. 313, 317 (1977) (quoting *Craig v. Boren*, 429 U.S. 190, 197 (1976)). Subsequent to *Croson*, the Sixth Circuit began subjecting gender-based affirmative-action plans to strict scrutiny. *See Brunet v. City of Columbus*, 1 F.3d 390, 404 ("Under the [post-*Croson*] precedent in this Circuit, gender based affirmative action plans are subject to strict scrutiny when challenged under the Equal Protection Clause." (citing *Conlin v. Blanchard*, 890 F.2d 811 (6th Cir. 1989); *see also Long v. City of Saginaw*, 911 F.2d 1192 (6th Cir. 1990). The other circuits to have considered the issue have concluded that, notwithstanding *Croson,* gender-based affirmative-action plans remain subject to intermediate scrutiny. *See Ensley Branch*, 31 F.3d at 1580 ("Intermediate scrutiny remains the applicable constitutional standard in gender discrimination cases."); *Contractors Ass'n v. City of Philadelphia*, 6 F.3d 990, 1001 (3d Cir. 1993) ("We agree with the district court's choice of intermediate scrutiny to review the Ordinance's gender preference."); *Coral Constr. Co. v. King County*, 941 F.2d 910, 932 (9th Cir. 1991) ("[W]e shall employ intermediate scrutiny to review King County's [Women-Owned Business Enterprise] program."); *cf. Milwaukee County Pavers Ass'n v. Fiedler*, 922 F.2d 419, 422 (7th Cir. 1991) (assuming that *Croson* applied to gender-based affirmative

action because state failed to argue that it did not, but noting that "*Croson* is about favoritism toward racial and ethnic groups, not about favoritism toward women"). The Second Circuit has recognized this circuit split, but has yet to weigh in on it. *See Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 62 (2d Cir. 1992) ("*Croson* may not apply to women-owned business enterprise programs, *see Milwaukee County Pavers*, 922 F.2d at 422, and the appropriate standard of review concerning gender-based set-asides remains unclear.").[51]

The difference between strict and intermediate scrutiny has a very real impact in this case. According to the United States' Relief Chart, 19 women received relief under the recruiting claim. If strict scrutiny applies, then that relief is, for the reasons discussed in connection with race-based relief under the recruiting claim, unconstitutional; however, in the Court's opinion, the relief survives the more permissive standard of intermediate scrutiny.

As the Seventh Circuit recognized in *Milwaukee County Pavers*, the Supreme Court does not consider gender discrimination "to be as invidious – as harmful and as difficult to justify – " as race discrimination. 922 F.2d at 422. The Court agrees with the Eleventh Circuit that "[n]othing in *Croson* suggests that the Supreme

---

[51]The Court recognizes that the plan at issue in *Barhold* was both race- and gender-conscious and that the Second Circuit nevertheless subjected the plan to strict scrutiny. Since, however, the court concluded that the plan survived the rigorous "narrowly tailored" standard, *see* 863 F.2d at 238, it did not have to address the possibility that a lesser standard might apply to affirmative action for women. *Cf. Ensley Branch*, 31 F.3d at 1580 (distinguishing prior case applying strict scrutiny to gender-based affirmative-action plan because "[w]e did not need to do [consider whether a less-exacting standard applied], given our holding that the plan satisfied even the searching *Croson* test").

Court intended *sub silentio* to strike down its own decisions applying intermediate scrutiny to gender classifications," *Ensley Branch*, 31 F.3d at 1579, and its observation that the Sixth Circuit reached a contrary conclusion "with little or no discussion." *Id.* The Court concludes, therefore, that intermediate scrutiny continues to apply to gender-based affirmative-action plans.[52]

### 1. Important Governmental Interest

As with classifications subject to strict scrutiny, remedying past discrimination "is unquestionably a sufficiently 'important' [interest] to sustain a gender-conscious affirmative action program[,]" *Eng'r Contractors Ass'n of South Fla. Inc. v. Metro. Dade County*, 122 F.3d 895, 908-09 (11th Cir. 1997); however, "[u]nlike the strict standard of review applied to race-conscious programs, intermediate scrutiny does not require any showing of governmental involvement, active or passive, in the discrimination it seeks to remedy." *Coral Constr. Co.*, 941 F.2d at 932; *see also Ensley Branch*, 31 F.3d at 1580 ("One of the distinguishing features of intermediate scrutiny is that, unlike strict scrutiny, the government interest prong of the inquiry can be satisfied by a showing of societal discrimination in the relevant economic sector.").

Since there were at least six standard deviations between the actual and expected number of female applicants for each of the challenged exams, *see* Tables, *supra* pp. 14-15, there is a strong evidentiary basis that women have, to a significant extent, been shut out of permanent custodial positions. While, as explained, there is

---

[52]As the Eleventh Circuit has recognized, "[w]hile it may seem odd that it is now easier for uphold affirmative action programs for women than for racial minorities, Supreme Court precedent compels that result." *Ensley Branch*, 31 F.3d at 1579.

insufficient evidence connecting the disparity to any action by the Board, such a connection is not necessary to satisfy the "important governmental interest" prong.

## 2. Substantially Related

Since the award of retroactive seniority is, for purposes of transfers and TCAs, narrowly tailored to the goal of remedying prior race and ethnic discrimination, it necessarily satisfies the lesser standard of being "substantially related" to the goal of remedying past gender discrimination. The converse, however, is not necessarily true; i.e., that the grant of seniority for purposes of layoffs fails the narrowly-tailored prong of strict scrutiny does not necessarily mean that it would *ipso facto* fail the substantially-related requirement of intermediate scrutiny.[53]

"The purpose of requiring [a substantial] relationship is to assure that the validity of a [gender-conscious] classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women." *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982). In the affirmative-action context "a gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened," but "only if members of the gender benefitted by the classification actually suffer[ed] a disadvantage related to the classification." *Id.* at 728.

Research has revealed no case either accepting or rejecting preferential layoff protection as "substantially related" to the goal of remedying gender

---

[53]Once again, the Court addresses the Fourteenth Amendment to obviate any need for remand.

discrimination. Here, however, that remedy satisfies the standards articulated in *Hogan*. The statistical evidence demonstrates that women, as a class, were at a disadvantage when it came to learning about the exams that could lead to permanent custodial positions. And increased layoff protection, far from being based on gender stereotyping, helps women as a class move toward the job security they would have enjoyed but for that disadvantage. In the Court's view, therefore, preferential seniority for female beneficiaries for purposes of layoffs, even though they be non-victims, satisfies the substantially-related prong of intermediate scrutiny, although it does not satisfy the more restrictive unnecessarily trammeling standard under Title VII.

## **Remaining Matters**

### A. Propriety of Entry of a Consent Judgment

The Court cannot enter those parts of Paragraphs 13-16 that have survived the Brennan intervenors' challenges as a consent judgment. In the first place, the Agreement was executed on February 11, 1999, and under Paragraph 11 was to "remain in force for a period of four years." Also, the Agreement provided in Paragraph 47 that although the Court shall retain jurisdiction to ensure compliance, its jurisdiction "shall automatically terminate at the expiration of [the Agreement] as set forth in paragraph 11." Magistrate Judge Levy, with the consent of all parties, entered all of its provisions save the challenged Paragraphs 13-16 as a consent judgment on February 28, 2002 – well within that four year period – and the Court had jurisdiction to enforce it until February 11, 2003. The same enforcement limitation would have attached to Paragraphs 13-16 if they had also been reduced to judgment prior to the expiration period. *See EEOC v.*

*Local 40, Int'l Assn. Of Bridge, Structural & Ornamental Iron Workers*, 76 F.3d 76, 80 (2d Cir. 1996) (holding that court is without power to enforce decree after its underlying expiration date). In short, even if all of the provisions of Paragraphs 13-16 were deemed valid, the Court would nonetheless decline to reduce them to a judgment which it would be powerless to enforce.

Regardless, without the Brennan intervenors' consent, the challenged paragraphs could not be entered as a consent decree even in the absence of the Agreement's termination provision since, as the circuit court noted in remanding, "[s]eniority is a contractual right[,]" *New York City Bd. of Educ.*, 260 F.3d at 131 (citation omitted); consequently, the Brennan intervenors' consent would be required as a pre-condition to the Court lending its imprimatur to an Agreement affecting such a legally protected interest. *Compare United States v. City of Miami*, 664 F.2d 435 (5th Cir. 1981) (en banc) (consent decree that permitted promotions to be made without following the city's civil-service testing procedure could not be entered over the objection of the police officer's union to the extent that the decree altered the city ordinance governing promotion procedures incorporated into the union's collective bargaining agreement with the city), *and United States v. City of Hialeah*, 140 F.3d 968, 981 (11th Cir. 1998) ("[A] proposed consent decree is due to be rejected if it would affect the legal rights of the objecting parties."), *with Kirkland v. New York State Dep't of Corr. Servs.*, 11 F.2d 1117, 1127-28 (2d Cir. 1983) (holding that non-minority employees would not be permitted to intervene and block entry of consent decree in Title VII case since they "d[id] not have a legally protected interest in the *mere* expectation of appointments which could only be

made pursuant to presumptively discriminatory employment practices"), *Waisome v. Port Auth. of N.Y. & N.J.*, 999 F.2d 711, 715 (2d Cir. 1993) (rejecting union's objection to consent decree where it would not alter any contractual right held by union), *and Local No. 93*, 478 U.S. at 530 (although permitted to intervene, union could not block consent decree where decree did not impose any obligations on union and union "failed to raise any substantive claims").[54]

**B. Class Certification**

The Brennan intervenors in Action I and the plaintiffs in Action II (collectively, the "Brennan parties") seek class certification with respect to their claims for injunctive and declaratory relief. None of the other parties in either action has submitted responsive papers. In light of the Court's holding that the Brennan parties' are entitled to the restoration of their seniority rights as to layoffs, and the injunctive relief that they will be entitled to once the Court determines which of the beneficiaries are non-victims, the Court must now decide whether to certify a class.

Fed. R. Civ. P. 23(b)(2) authorizes class-action status where the opposing party "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." The Brennan parties' claims for injunctive and

---

[54]Those parties supporting the entry of the full Agreement as a consent decree argue that under 42 U.S.C. § 2000e-2(n)(1) the entry of an expired decree would nonetheless "provide[] significant protection for employers from challenges to the lawfulness of employment actions taken to implement a consent judgment." Arroyo Intervenors' Mem. of Law Supporting Entry of the Challenged Provisions of the Agreement at 20. Since the Agreement has been implemented, and this litigation will determine the lawfulness of its implementation, the final judgment of the Court will realistically provide sufficient protection against any future challenges.

declaratory relief fit squarely within that definition to the extent that their rights have been violated.

To warrant class-action status, however, the proposed class must also meet the prerequisites of Rule 23(a)(1-4), namely numerosity, commonality, typicality, and adequacy of representation.[55] The Court is satisfied that the Brennan parties have met these requirements insofar as they are entitled to injunctive relief to preserve their seniority rights in respect to layoffs.

The first requirement, numerosity, requires that a finding that the class is so numerous that joinder of all class members is impracticable. *See Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). Citing a leading treatise, the Second Circuit has noted that "the difficulty in joining as few as 40 class members should raise a presumption that joinder is impracticable." *Id.* at 936 (citing 1 Herbert B. Newberg, *Newberg on Class Actions: A Manual for Group Litigation at Federal and State Levels* § 3.05 (2d ed. 1985)). There are clearly more than 40 non-minorities whose layoff-protection rights have been impacted: Since the grants of retroactive seniority under the testing claims were based on the median hire date of candidates hired from the eligibility lists resulting from the exams, they necessarily affected the layoff protection of at least half of those on each list;

---

[55]Fed. R. Civ. P. 23(a) provides:

> Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

thus, the beneficiaries who received relief under the testing claims displaced at least 77 of the 154 candidates hired from the eligibility list for Exam No. 5040, at least 23 of the 46 candidates hired from the eligibility list for Exam No. 8206, and at least 122 of the 244 candidates hired from the eligibility list for Exam No. 1074. Furthermore, it is safe to assume that a significant number of the 300 individuals who submitted written objections to Magistrate Judge Levy were custodial employees whose layoff-protection rights were adversely affected by the Agreement.

The Brennan parties also satisfy Rule 23(a)(2)'s commonality and Rule 23(a)(3)'s typicality requirements. With respect to the commonality requirement, they are victims of a common wrong – that, as a matter of law, their layoff-protection rights have been compromised. *See Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) ("The commonality requirement is met if plaintiffs' grievances share a common question of law or fact."). This applies with equal force with respect to the typicality requirement. *See id.* at 376 ("[The typicality requirement] is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." (citations and internal quotation marks omitted)).

The Brennan parties have also demonstrated that they will adequately represent the class – Rule 23(a)'s final requirement. In order to satisfy this requirement, the Brennan parties' attorney must be "qualified, experienced, and generally able to conduct the proposed litigation," and they must not have interests antagonistic to those of the remainder of the class. *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir.

1968). The Court is satisfied, given the unchallenged information in the Statement of Michael E. Rosman regarding his past experience, that counsel is sufficiently experienced in class actions and in discrimination law to fairly and adequately represent the proposed class. Furthermore, the Brennan parties do not have interests that are at odds with the putative class; the injunctive relief they seek will be the same relief to which the entire class will be entitled.

Thus, the Court will certify a class comprising all custodial employees whose layoff-protection rights have been adversely affected by the grant of seniority benefits to beneficiaries who are non-victims of discrimination.[56]

Because the Court has certified the class under Rule 23(b)(2), it need not provide notice to the class members or afford them an opportunity to opt out. *See* Fed. R. Civ. P. 23(c)(2)(A) advisory committee's note ("The court may decide not to direct notice after balancing the risk that notice costs may deter the pursuit of class relief against the benefits of notice."); *Larsen v. JBC Legal Group, P.C.*, 235 F.R.D. 191, 196 (E.D.N.Y. 2006) ("Rule 23(b)(2) does not require notice or permit class members the opportunity to opt-out." (citing Fed. R. Civ. P. 23(c)(2)(A))). As a practical matter, notice of the Court's decision will undoubtedly be given to all the Board's custodial employees by their union leaders, who are well-schooled in protecting their rights.

---

[56]In light of the Court's holding that the Brennan parties are also entitled to the restoration of seniority rights disrupted by the relief granted to blacks, Hispanics and Asians under the recruiting claim, it might also be appropriate to certify a class comprising employees whose seniority rights were adversely affected by such relief; however, the Court declines to certify such a class based on the present record, which does not reflect that the number of those so affected is sufficient to satisfy Rule 23(a)'s numerosity requirement.

# RECAPITULATION

## A. Testing Claims

The testing claims affected only blacks and Hispanics. If the United States' Relief Chart is proven to be accurate, 28 were afforded full retroactive seniority. The rights of one, Luis Torres, cannot be determined until the Court resolves the factual dispute as to whether Exam No. 8206 had a disparate impact on Hispanics. As for the remaining 27, seven are actual victims of discrimination and they are therefore entitled to full retroactive seniority for all purposes; as for the other 20, if it is factually established that they were not victims of discrimination, they would be entitled to preferential seniority for school transfers and temporary care assignments, but not for layoffs.

## B. Recruiting Claim

According to the United States' Relief Chart, 31 blacks, Hispanics, Asians and women received full, unqualified retroactive seniority. Of that group, 12 were men; 19 were women. One of the men, Dellaporte, is neither black nor Hispanic; hence he is not entitled to any relief under any circumstances. As for the remaining 11 men, none is entitled to any relief, except for those who can factually establish that they were actually victims of discrimination. As for the women, all of them are entitled to preferential seniority for school transfers and temporary care assignments; however, unless they can prove that they were actual victims of discrimination, they would not be entitled to preferential seniority for layoffs.[57]

---

[57]The Court declines to rule out the possibility that some beneficiaries were actual victims of recruiting discrimination, but is dubious that it can be proven given

## C. Reflections

The Court has studied innumerable Supreme Court, circuit court and district court decisions relevant to the issues raised in this litigation; none has approached the complexities of this case, representing a veritable *tour de force* of virtually every aspect of affirmative-action law in the employment arena. This legal juggernaut emanated from the need to adjudicate multiple disparate-impact claims under both Title VII and the Fourteenth Amendment in respect to the effect preferential seniority had on three different seniority benefits – school transfers, temporary care assignments and layoffs – requiring the application of three different standards: the manifest imbalance/unnecessary trammeling standard applicable to all the beneficiaries under Title VII analysis, and the two separate standards applicable to race-based and gender-based relief under constitutional analysis; moreover, many of the issues subsumed by these analyses have yet to be passed upon by the Supreme Court or the Second Circuit.

Given the contentious history of this litigation and the importance of the issues raised, the parties undoubtedly will not rest with the district court's decision. Before an appeal can be taken to the Second Circuit, finality will have to be achieved; in light of the wide range of legal issues and the handful of simple factual issues that can readily be resolved, the Court will not be inclined to certify its decision for interlocutory review. The Court exhorts the parties to resolve these factual issues by stipulation since

_____

the lack of evidence of a causal connection between the number of women and minority test-takers and the Board's recruiting practices.

it is in the best interests of all parties, after ten years of litigation, to allow the Court to expeditiously enter a final judgment.

## CONCLUSIONS

1. The Board's motion to enter the Agreement as a consent judgment is denied.

2. The Brennan parties' motion for class certification is granted to the extent that the Court certifies a class comprising all custodial employees whose layoff-protection rights have been adversely affected by the grant of seniority benefits to beneficiaries who are non-victims of discrimination.

3. Regarding the intervenors' motions for partial summary judgment, the Court declares as follows:

> a. As for the testing claims, all beneficiaries who received relief, except Luis Torres, are entitled to the seniority benefits provided by the Agreement as to transfer rights and temporary care assignments; as for layoffs, however, the grant of seniority benefits to beneficiaries who are not victims of discrimination violates Title VII and the Fourteenth Amendment.

> b. As for the recruiting claim, the grant of seniority benefits for any purpose to black, Hispanic and Asian males who were not victims of discrimination violates the Fourteenth Amendment. As for the women, they are entitled to the seniority benefits provided by the Agreement as to transfer rights and temporary care assignments; as for layoffs, however, the grant of seniority benefits to women who are not victims of discrimination violates Title VII.

> c. Dellaporte is not a member of a protected class; therefore, he is not entitled to any relief.

4. A hearing is required as to (a) which, if any, of the beneficiaries, in addition to Lloyd Bailey, Joseph Christie, Belfield Lashley, Gilbert Rivera, Peter Robertin, Felix Torres and Mayra Zephrini (Cintron), are actual victims of discrimination and received the relief to which they were entitled; (b) whether the results of Exam 8206 in respect to Luis Torres satisfy the evidentiary standards for establishing discrimination under Title VII and the Fourteenth Amendment; and (c) whether John Mitchell and Eric Schauer were denied transfers in favor of particular individuals who impermissibly received retroactivity seniority.

5. In the absence of a stipulation resolving the factual issues, the parties shall appear before the Court on October 11, 2006, at 5 p.m., to set a hearing date.

**SO ORDERED.**

_____
FREDERIC BLOCK
Senior United State District Judge

September 11, 2006
Brooklyn, New York